UNITED STATES of America, Plaintiff-Appellee,

v.

Joseph ARNOLD and Joseph Grieco, Defendants-Appellants.

Nos. 84–2139, 84–2176.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1985.

Decided Sept. 18, 1985.

Patrick A. Tuite, Donald R. Harris, Jenner & Block, Chicago, Ill., for defendants-appellants.

Paul Larkin, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before BAUER and COFFEY, Circuit Judges, and BROWN, Senior District Judge.*

COFFEY, Circuit Judge.

The defendants, Joseph Arnold and Joseph Grieco, appeal their convictions for conspiring to obstruct justice by corruptly influencing a witness to refuse to testify before a Federal grand jury and for obstruction of justice. We affirm.

I

The defendants' trial in the United States District Court for the Northern District of Illinois revealed that on June 5, 1978, a Federal grand jury investigating the loan sharking activities of Arnold and Grieco subpoenaed one Ralph Carazzo to testify about his debts with the defendants. Carazzo appeared before the grand jury but, rather than testify, he invoked his Fifth Amendment privilege against self-incrimination in response to the grand jury questions. On April 2, 1979, some ten months

* The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation.

later, Chief Judge Parsons authorized the Government to install an eavesdropping device at Mr. Arnold's place of business, a small dry goods store known as "Odds & Ends," to intercept Arnold's conversations relating to unlawful interference with interstate commerce by means of threats of violence, in violation of the Hobbs Act, 18 U.S.C. § 1951, and conspiracy, in violation of 18 U.S.C. § 371. On May 31, 1979, the eavesdropping device recorded a conversation between Arnold and Grieco concerning the Federal grand jury's investigation of their loan sharking activities and the possibility that Carazzo might be recalled to testify. During the conversation the defendants, Arnold and Grieco, determined that Carazzo and, perhaps, one other debtor might possibly incriminate them. Arnold and Grieco concluded: "[w]e need to step on him a little, ya know, we can't just let him go ahead." The two men further agreed that they would "take care of the people that take care of you."

Shortly thereafter, the grand jury subpoenaed Carazzo to appear on June 13, 1979. Carazzo informed Arnold of the subpoena and Arnold met with Grieco on June 7, 1979, six days before Carazzo's scheduled grand jury appearance, to discuss the possibility of Carazzo testifying. The defendants agreed that "[Carazzo] gotta take the advice of the lawyer and do whatever the lawyer tells 'em." Arnold and Grieco further agreed to meet with Carazzo and his lawyer, and that they would "take care of" Carazzo if he were to be imprisoned for refusing to testify. Later that same day, Arnold and Grieco met with Carazzo to discuss his grand jury appearance. Grieco informed Carazzo that if he did not testify, Arnold and Grieco would take care of his expenses, provide an attorney, forgive his debt, visit him in jail if he were imprisoned for remaining silent, and provide him with spending money while he was incarcerated. Grieco, after reminding Carazzo of the financial assistance he had given him in the past, warned him, "by saying what they want ya to say, they're not gonna shadow you all their life." Grieco also suggested that Carazzo ask to consult with his attorney after each and every question to discourage the grand jury from pursuing its examination of him.

On June 9, 1979, Grieco advised his co-defendant Arnold of all the details of his meeting with Carazzo, and Carazzo's attorney. According to Grieco, he told Carazzo:

"Let's call a spade a spade, you hear, you're going our way, or you're going their _____ way. And I told 'em (inaudible) and they don't protect you when its all over with either. I says they throw you to the _____ street, they don't give a _____. They're only trying to use ya."

Grieco further related to Arnold that he had promised to pay the lawyer's fee of $500.00 and to provide Carazzo with money to spend at the prison commissary. Additionally, Grieco advised Arnold that he had cautioned Carazzo against discussing the arrangements with other inmates or on the prison phone because the phones were "tapped" and the inmates might very well be informers. Grieco and Arnold decided that Carazzo should pay his lawyer with a money order in order that their role might be obscured.

On June 12, Carazzo met with Arnold and Grieco to discuss his grand jury appearance the following day. Grieco told Carazzo that if he were to dress slovenly and pretend to be ill, the grand jury might think that he was unimportant and uninteresting. Grieco and Arnold also told Carazzo to put his name, not theirs, on the money order for the lawyer's fee.

On June 13, Carazzo appeared before the grand jury and, after answering the first question asking for his name, invoked his Fifth Amendment privilege against self-incrimination in response to each and every question thereafter. The prosecutor informed Carazzo that he could receive immunity and be forced to testify or imprisoned for contempt for failure to testify under court order, and that the Government could, and would, protect him if he were in danger. Carazzo continued to invoke his privilege against self-incrimination

and was excused. Later that day, Carazzo met with Arnold and informed him that the Government played a tape in which Grieco and one James Inendino discussed the sale of Carazzo's debt to Grieco. Carazzo also told Arnold that he had been asked to identify several photographs, including one of Arnold and Grieco. Carazzo reassured Arnold several times during the conversation that he had invoked his privilege against self-incrimination in response to all questions except the first, asking for his name.

On November 28, 1979, some five months later, the Government obtained an immunity order compelling Carazzo to testify before the grand jury. Carazzo appeared before the grand jury on November 29 and again refused to answer any questions. Carazzo then moved to suppress the grand jury's questions on the ground that they were the product of illegal surveillance, but the motion was denied. Carazzo continued in his refusal to answer grand jury questions and was subsequently confined for eighteen months for contempt of court. Carazzo never testified before the grand jury.

At trial, Arnold and Grieco, who neither testified nor called witnesses, argued to the jury that Carazzo had independently decided to invoke his Fifth Amendment privilege against self-incrimination. Thus, under their view, the Government had failed to prove that they corruptly influenced Carazzo to invoke his self-incrimination privilege before the grand jury. The jury convicted each defendant on both the conspiracy to obstruct justice and the obstruction of justice counts. The defendants were sentenced to five years imprisonment and fined $10,000 for the obstruction of justice convictions and were placed on probation for five years, beginning upon their release from confinement, for the conspiracy convictions. On appeal they argue (1) the trial court erred in denying their pretrial motion to suppress the conversation taped by the eavesdropping device; (2) the Omnibus Clause of the pre-1982 version of the Federal Obstruction of Justice statute, 18 U.S.C. § 1503, does not apply to witnesses;

(3) the district court erred in admitting "other acts" evidence; and (4) the evidence failed to show that they endeavored to influence Carazzo's testimony before the grand jury.

## II

### A. The Motion to Suppress the Taped Conversations

In their pretrial motion to suppress the taped conversations, the defendants argued that the Government violated 18 U.S.C. § 2517(5) requiring the Government to make application to the court "as soon as practicable" when it intends to testify before a grand jury or in any criminal proceeding about intercepted communications involving offenses other than those for which the court originally authorized interception. As the defendants noted in their motion to suppress, the Government alleged in their original application for a wire intercept that it had probable cause to believe that it would intercept communications relating to two crimes: the unlawful interference with interstate commerce by means of threats or violence, in violation of the Hobbs Act, 18 U.S.C. § 1951 (the making of "protection" payments by the operators of certain businesses in the Rush Street area of Chicago, Illinois); and conspiracy to commit the Hobbs Act offense, in violation of 18 U.S.C. § 371. The court authorized the Government to intercept communications relating to the Hobbs Act and conspiracy offenses at "Odds & Ends," Arnold's dry goods store, for thirty days. On May 25, 1979, Judge Parsons authorized a second wiretap at "Odds & Ends" to obtain evidence of the Hobbs Act and the conspiracy offenses as well as the "loan sharking" offenses—making extortionate extensions of credit, in violation of 18 U.S.C. § 892, and using extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894. The nine communications involved in the present prosecution for obstruction of justice were all intercepted during this second period of surveillance; the first conversation concerning

Carazzo's testimony before the grand jury was intercepted on May 31, 1979; the last conversation involving his testimony was intercepted on June 13, 1979.

On January 17, 1983, some thirty-one months later, the Government submitted an application to and received authorization from Judge McGarr, who replaced Judge Parsons as chief judge, to present the conversations concerning obstruction of justice to a grand jury, pursuant to 18 U.S.C. § 2517(5). In their motion to suppress, the defendants argued that the thirty-one month delay between the interception of the other crime conversations and the application to the court for testimonial use of the wiretap evidence violated the § 2517(5) rule that the application for testimonial use must be made "as soon as practicable." The district court held that the "as soon as practicable" provision in § 2517(5) was not meant "to impose strict time limits and disclosure burdens upon the Government but only to insure that the original wiretap order was lawfully obtained, in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *United States v. Arnold,* 576 F.Supp. 304, 308 (N.D.Ill.1983). In the alternative, the court held that even if the delay violated § 2517(5), suppression of the evidence was not warranted because the defendants failed to establish how the delay prejudiced their defense. *Id.* at 309. On appeal, the defendants renew their argument that the delay violated the "as soon as practicable" provision of § 2517(5) and that the proper remedy for this alleged violation is suppression of the evidence. Specifically, the defendants contend that the § 2517(5) provision for post-interception approval "was devised by Congress to insure that the Government would not use an authorization order premised on a showing of probable cause for a particular offense as a subterfuge to intercept evidence of other offenses for which the Government did not have probable cause ... [and] to allay the fears of unwarranted invasions of privacy by setting up a system of step-by-step regulation of wiretap procedures, with judicial oversight and control as the most important safeguard." Additionally, Arnold and Grieco assert that the intention of Congress "was not to give free reign to the Government to stockpile indefinitely recorded conversations for possible future use." Thus, under the Arnold and Grieco theory, a duty is imposed upon the Government to apply to a court at the time the new crime—i.e., a crime not listed or referred to directly in the original wiretap authorization, is discovered; the Government contends that the duty to apply for court authorization under § 2517(5) arises when the Government decides to make testimonial use of the intercepted communications concerning the new crime. Thus, the defendants ask us to impose a type of statute of limitations on the testimonial use of this wiretap evidence despite the fact that such a time limitation is not contained in nor referred to in the statute.

Section 2517(5) provides:

"When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable."

Subsection (3) allows law enforcement officers to disclose intercepted communications or evidence derived from intercepted communications "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof." 18 U.S.C. § 2517(3) (West Supp.1985).

Section 2517(1) allows law enforcement officers to disclose the contents of an intercepted communication "to another investigative or law officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." Section 2517(2) permits a law enforcement officer to use the contents of an intercepted communication "to the extent such use is appropriate to the proper performance of his official duties."

 Initially we address the defendants' contention that the duty to seek judicial approval of the wiretap arises at the time of the interception of new crime conversations to prevent the Government from engaging in a subterfuge search and not at the time of testimonial use, as the government contends. The post-interception application requirement of § 2517(5) is designed to prevent subterfuge searches:

"The framers of Title III presumably intended by this requirement to prevent evasion of the several restrictions upon original applications (e.g., showing of probable cause, enumerated serious crime, ineffectiveness of other investigatory techniques as to that offense). Otherwise, the applicant could easily name one crime while in fact he may have anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. Such 'subterfuge searches,' in addition to their dissonance with Title III, would indeed run afoul of the Fourth Amendment."

*United States v. Marion,* 535 F.2d 697, 700–01 (2d Cir.1976); *see also United States v. Williams,* 737 F.2d 594, 606 (7th Cir.1984); *United States v. Brodson,* 528 F.2d 214, 215 (7th Cir.1975); *United States v. Campagnuolo,* 556 F.2d 1209, 1213 (5th Cir.1977); *United States v. Vento,* 533 F.2d 838 (3d Cir.1976); *United States v. Harvey,* 560 F.Supp. 1040 (S.D.Fla.1983); *United States v. Pine,* 473 F.Supp. 349 (D.Maryland 1978). The substantive requirements of a post-interception application under § 2517(5) call for: "a showing that the original order was lawfully ob-

tained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." S.Rep. No. 1097, 90th Cong., 2d Sess. 66, *reprinted in* 1968 U.S. Code Cong. & Ad.News, 2112, 2189. The factors that the court must consider must be present at the time the original application was made—i.e., a showing that the original application met the requirements of probable cause, enumerated serious crime and ineffectiveness of other investigatory techniques as to that offense and further that the application was made in good faith. § 2518. The mere passage of time between the time of interception and the time of testimonial use does not allow the Government to avoid or to evade these factors (probable cause, enumerated crime, ineffectiveness of other investigatory techniques and good faith). Because we fail to understand how the passage of time between the time of interception and the time of testimonial use allows the Government to alter these factors, we hold that requiring the Government to submit a judicial application immediately upon intercepting new crimes evidence is unnecessary to satisfy the purpose of § 2517(5), i.e., to safeguard a defendant from subterfuge searches and we reject the defendants' novel and ridiculous attempt to read into the statute a statute of limitations on testimonial use. Moreover, a review of the overall statutory scheme reveals that § 2518(5) in combination with the post-interception application requirement of § 2517(5) adequately protects the intercepted parties' privacy interests. The legislative history of § 2517 notes that § 2517 must be read in light of § 2518. S.Rep. No. 1097, 1968 U.S.Code Cong. & Ad.News, at 2188. Section 2518(5) protects the parties' privacy by requiring the Government to limit the length of the interception to a period "necessary to achieve the objective of the authorization" and further requires the agents to "minimize the interception of communications not otherwise subject to

interception under this chapter." [1] Because § 2517 must be read in light of § 2518, the Government in its post-interception application must assure the court that the duration and minimization requirements of § 2518(5) have been satisfied.

Finally, the defendants' Madison Avenue phrasing of his argument that Congress did not intend to allow the Government to "stockpile recordings" indefinitely without seeking judicial approval ignores the very specific distinction § 2517(5) draws between the various uses of intercepted communications containing evidence of new crimes.

> " 'Unrelated' communications may be disclosed or used without judicial authorization if such use is in conformity with subsections (1) and (2) of section 2517. Subsections (1) and (2) permit the disclosure of 'unrelated' communications to other investigative officers and the use of the communications by the recipient officer 'to the extent such use is appropriate to the proper performance of his official duties.' On the other hand, subsections (3) and (5) require judicial approval for the disclosure of 'unrelated' communications in connection with 'giving testimony under oath or affirmation in any proceeding held under the authority of the United States. . . .' "

*Vento*, 533 F.2d at 854; *United States v. De Palma*, 461 F.Supp. 800 (S.D.N.Y.1978). Indeed, our court has held that the Fourth Amendment is not violated when law enforcement officers review recorded conversations during the course of a continuing investigation because the parties no longer have a constitutionally protectible privacy interest in the conversations. *United*

States v. Williams, 737 F.2d 594, 606 (7th Cir.1984).

Moreover, a review of the cases where defendants moved to suppress evidence on the ground that the application for testimonial use was not made "as soon as practicable," reveals that courts have admitted evidence so long as the application for admission was made as soon as practicable prior to the proceeding in which the evidence was to be used. *See, e.g., United States v. Vento*, 533 F.2d 838, 855 (3d Cir.1976); *United States v. Harvey*, 560 F.Supp. 1040, 1081 (S.D.Fla.1983); *United States v. Pine*, 473 F.Supp. 349, 352 (D.Md.1979); *United States v. De Palma*, 461 F.Supp. 800, 825 (S.D.N.Y.1978); *United States v. Aloi*, 449 F.Supp. 698, 716 (E.D.N.Y.1977).

▮ The defendants argue that the "as soon as practicable" provision of § 2517(5) was violated solely by the thirty-one month delay in seeking the application for testimonial use; the defendants do not challenge the initial authorization for the installation of the electronic surveillance device at "Odds & Ends" dry goods store. Moreover, the district court, in its ruling on the motion to suppress, found that the Government's § 2517(5) application was proper and confirmed Chief Judge McGarr's finding that the original wiretap order was lawfully obtained, in good faith and not as a subterfuge. Finally, the district court found that the defendants failed to present evidence establishing prejudice caused by the delay. We hold that § 2517(5) was not violated because the original electronic surveillance order was lawfully obtained, in good faith and not as a subterfuge, and a post-interception application under § 2517(5) was made "as soon as practica-

1. 18 U.S.C. § 2518(5) provides in full:
"No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than 30 days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than 30 days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communication not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days."

ble" before testimonial use was made of the intercepted conversations.

## B. The Scope of the Pre-1982 Version of 18 U.S.C. § 1503

The defendants argue that they were improperly charged with obstruction of justice under the pre-1982 version of 18 U.S.C. § 1503 because, under their theory, the Omnibus Clause of the statute did not apply to witnesses. According to Arnold and Grieco, the following comments by Senator Heinz of Pennsylvania, a principal sponsor of the bill amending § 1503, demonstrates that Congress believed that the Omnibus Clause of the pre-1982 version of the statute did not apply to attempts to corruptly influence or intimidate witnesses.

> "The Senate-passed bill allowed a slight overlap between old section 1503 and new sections 1512 and 1513. The House version amends section 1503 so it will make no mention of and provide no protections to, supenaed [sic] witnesses. The compromise accepts the House position. By amending section 1503 in this way, their proposal will contribute to a clearer and less duplicative law."

128 Cong.Rep. § 13063 (Daily Ed. October 1, 1982).

The pre-1982 version of section 1503 (with the Omnibus Clause enclosed in brackets) provided:

> "*Section 1503 influencing or injuring officer, juror or witness generally...*
>
> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner or any other committing magistrate in his person or property on account of his performance of his official duties [or corruptly or by threat or force or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years or both.]"

June 25, 1948, ch. 645, 62 Stat. 769.

Courts interpreting the Omnibus Clause of the pre-1982 version of § 1503 have uniformly held that the statute made it a crime to corruptly influence a witness to invoke his Fifth Amendment self-incrimination privilege before a Federal grand jury rather than testify. *See, e.g., United States v. McComb*, 744 F.2d 555, 563 (7th Cir.1984); *United States v. Baker*, 611 F.2d 964, 967–69 (4th Cir.1979); *United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir.), *cert. denied*, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974); *Cole v. United States*, 329 F.2d 437, 441–42 (9th Cir.), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964); *United States v. Cortese*, 568 F.Supp. 119, 128–29 (M.D.Pa. 1983).

Moreover, the legislative history of the amendment of § 1503 fails to support the defendants' argument that Congress believed that the Omnibus Clause of the pre-1982 version of the statute did not apply to witnesses. Congress was concerned with two problems when it amended the statute. First, Congress substituted "person" for witness to make clear that the scope of the offense is not exclusively limited to those witnesses under subpoena at the time of the alleged acts of intimidation or influence. S.Rep. No. 532, 97th Cong., 2d Sess. 15–16, *reprinted in* 1982 U.S.CODE CONG., &

AD.NEWS 2515, 2520–22. Secondly, Congress expanded the scope of prohibited conduct to include verbal harassment. *Id.,* S.Rep. No. 532 at 15; 1982 U.S.CODE CONG. & AD.NEWS at 2521. A review of the legislative history reveals that Congress was well aware that the Omnibus Clause of the pre-1982 version of § 1503 applied to witnesses and that proof of "corruption," as well as "threats or force," were sufficient for conviction under the statute. *Id.,* S.Rep. No. 532 at 14–15; 1982 U.S.CODE CONG. & AD.NEWS at 2520–21. Courts interpreting ambiguous legislation must not be influenced by isolated, selective quotations from legislative hearings. "The remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). A careful review of a legislative history must include the entire record of the hearings to gain a proper understanding of Congress' intent. We hold that the defendants' assertion that Congress believed that the Omnibus Clause of the pre-1982 version of § 1503 did not apply to attempts to corruptly influence or intimidate witnesses is without merit.

## C. Other Acts Evidence

 Arnold argues that the district court erred in admitting a conversation in which he recounted how his failure to meet an incarcerated witness' demands for money led to his conviction for submitting a false tax return in 1973, and, along with Grieco, contends that the admission of several recorded statements concerning their loan sharking activities was erroneous. In *United States v. Levy,* 741 F.2d 915, 924 (7th Cir.1984), we emphasized that:

"[t]his circuit, among others, has time and time again responded to the type of argument raised by appellant and should not have to do so again except in an appropriate case.... Evidence of wrongs committed by a defendant are admissible under Fed.R.Evid. 404(b) to show 'intent' ... or absence of mistake or accident.... Although admissible under Rule 404(b), evidence may still be

excluded if its probative value 'is substantially outweighed by the danger of unfair prejudice.' Fed.R.Evid. 403. The trial judge's assessment of relative probative value and unfair prejudice is generally accorded great deference because of his first-hand exposure to the evidence and his familiarity with the course of the trial proceeding."

*See also United States v. Hyman,* 741 F.2d 906, 913 (7th Cir.1984) (sound discretion and great deference); *United States v. Covelli,* 738 F.2d 847, 854 (7th Cir.1984) (broad discretion and great deference); *United States v. West,* 670 F.2d 675, 682 (7th Cir.1982) (broad discretion). Evidence of a prior criminal act is admissible if: "[1] the prior act is similar enough and close enough in time to be relevant; [2] the evidence of the prior act is clear and convincing; [3] the probative value of the evidence outweighs the risk of prejudice; and [4] the issue to which the evidence is addressed is disputed by the defendant." *Hyman,* 741 F.2d at 912. *See also United States v. Falco,* 727 F.2d 659, 662–63 (7th Cir.1984); *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984); *United States v. Cane,* 726 F.2d 344, 348 (7th Cir.1984). The Government may submit evidence of other acts to establish specific intent when specific intent is an element of the crime charged and when the other requirements of Rules 404(b) and 403 are satisfied. *See Shackleford,* 738 F.2d at 781. "Specific intent to impede a grand jury investigation is an essential element of a section 1503 violation." *McComb,* 744 F.2d at 555.

Arnold's discussion of his 1973 conviction for submitting a false tax return was taped on May 31, 1979 and was part of a conversation between himself and Grieco concerning the grand jury investigation of their loan sharking activities. When the May 31 conversation turned to the subject of incarcerated witnesses' testifying, Arnold informed Grieco that a former associate, "Pinkie," had asked Arnold for money so that Pinkie could pay an attorney to secure his release from prison. Arnold attempted to give Pinkie the money but was unsuc-

cessful. Pinkie later became the Government's chief witness against Arnold in a prosecution for falsely identifying the source of his income. Arnold argues that there is no "logical relevance between Arnold's prior conviction and incarceration and the ultimate fact the Government claimed to be trying to prove." Additionally, Arnold contends that Arnold's conviction should not have been admitted because it was too old.

Arnold's argument that the details of his unsuccessful attempt to supply money to the incarcerated witness is absurd. The point of Arnold's story was that it was necessary to fulfill any promises made to a potential witness to insure that the witness will remain silent if jailed for contempt. We hold that Arnold's contention that the discussion of the prior, unsuccessful attempt to bribe a witness lacks logical relevance to the case at hand is without merit. Moreover, the length of time elapsed since the commission of the prior act is not *per se* determinative of its admissibility under Rule 404(b). *United States v. Falco*, 727 F.2d 659, 664–65 (7th Cir.1984) (admitting convictions occurring in 1952, 1962, and 1978). The similarity of the prior conversation concerning witness bribery to the present offense and its probative value, not the time of occurrence, determines whether it is admissible under Rule 404(b). *Id.* at 665. We hold that the district court did not abuse its discretion in admitting this evidence because Arnold's previous unsuccessful attempt to obstruct justice (the attempt to bribe the witness Pinkie) is relevant and probative of his intent to now obstruct the grand jury's investigation of his loan sharking activity.

We next turn to Arnold and Grieco's joint argument that the admission of evidence concerning the defendants' extortionate extensions of credit to Carazzo and to others was improper under Fed.R. Evid. 403 and 404(b). A review of the challenged evidence revealed that it concerned: the terms of a debt Carazzo owed to one James Inendino and the sale of that debt to Grieco; the possibility that other debtors would testify before the grand jury; and, a conversation in which Joseph DiVarco, an associate of the defendants, asked Arnold whether Arnold had a two-hundred dollar payment for him.

"In order to show that a defendant has intimidated a witness in a grand jury investigation, it is appropriate for the Government to establish a motive by connecting him with the objects of the investigation.... Moreover, in order that the jury may assess the intensity of his motive, it should know the nature of the offense under investigation and the extent of the defendant's involvement; limiting the Government to a mysterious statement that the defendant was somehow connected with an investigation into some unidentified crime would unduly hamper its presentation. While allowing such proof in an obstruction case inevitably entails danger that the jury may convict the defendant for the crime previously investigated, this is a matter for cautionary instructions by the judge."

*United States v. Bradwell*, 388 F.2d 619, 620–21 (2d Cir.), *cert. denied,* 393 U.S. 867, 89 S.Ct. 152, 21 L.Ed.2d 135 (1968). The use of other acts evidence to establish the background of a scheme to obstruct justice is proper and often crucial in a § 1503 proceeding. *United States v. Harris*, 558 F.2d 366, 369 n. 4, 5 (7th Cir.1977). We hold that because the evidence regarding loan sharking activity established the background of the defendants' scheme, it was relevant. Furthermore, the probative value of Arnold and Grieco's motive and intent to obstruct justice outweighed any prejudice to the defendants. Finally, the evidence of loan sharking activity was clear and convincing and addressed an issue disputed by the defendants—whether they intended or were motivated to influence Carazzo. The four requirements for admitting evidence of a prior criminal act under Fed. R.Evid. 404(b), i.e., (1) relevance; (2) weight; (3) probative value; and (4) materiality were fulfilled. We hold that the district court did not err in admitting evidence of the defendants' loan sharking activities

because the evidence was admissible under Fed.R.Evid. 403 and 404(b).

### D. Sufficiency of the Evidence

The defendants also argue that the evidence failed to demonstrate that they endeavored to influence Carazzo's testimony before the grand jury. A jury verdict must be sustained if, taking the view most favorable to the Government, there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *Hyman*, 741 F.2d at 908. An appellate court may overturn a verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Hyman*, 741 F.2d at 908. In *United States v. Harris*, 558 F.2d 366, 369 (7th Cir.1977), this court construed § 1503 to require only a "reasonable tendency to impede the witness in the discharge of her duties." A review of the evidence presented to the jury reveals that the defendants corruptly endeavored to avoid indictment by silencing Carazzo through cajolery, intimidation, and bribery. The defendants promised Carazzo that they would take care of his expenses, provide an attorney, forgive his debt, visit him in jail if he were imprisoned for remaining silent, and provide him with spending money while he was incarcerated. Furthermore, the defendants reminded Carazzo that they had aided him in the past and would be in contact with him in the future. Specifically, the defendants threatened Carazzo and warned him not to talk when they remarked that the Government was not "gonna shadow you all their life" and that "they don't protect you when its all over with either." Finally, the jury heard evidence that Carazzo refused to and never did testify before the grand jury on two separate occasions, was found in contempt, and spent eighteen months in jail for refusing to testify. Furthermore, before entering jail, Carazzo repeatedly assured the defendants that he had not and would not testify before the grand jury about their loan sharking activities. Against this overwhelming evidence of wrongdoing, threats, and intimidation, the defendants assert that the evidence merely showed that they "hoped" Carazzo would not testify and that they "advised" him of his self-incrimination privilege. As our court held in *United States v. Cioffi*, 493 F.2d 1111 (7th Cir. 1974),

> "here we have something more than 'mere' advice.... [W]hile a witness violates no law by claiming the Fifth Amendment privilege against self-incrimination in a grand jury, one who bribes, threatens, coerces a witness to claim it or advises with corrupt motive a witness to take it, can and does obstruct or influence the administration of justice."

*Id.* at 1119. As Justice Holmes stated, "We agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). We hold that the Government produced substantial evidence of the defendants' guilt at trial and that the evidence was sufficient to permit a reasonable jury to find that the defendants, with corrupt motivation, endeavored to influence the witness, Carazzo.

Each of the convictions of the defendants, Arnold and Grieco, is AFFIRMED.