UNITED STATES of America, Plaintiff,

v.

David J. SHIELDS and Pasquale
F. DeLeo, Defendants.

No. 90 CR 1044.

United States District Court,
N.D. Illinois, E.D.

July 30, 1991.

See also 778 F.Supp. 956, 767 F.Supp.
163.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

The government alleges in this criminal prosecution that defendant David J. Shields, formerly the Chief Judge of the Chancery Division of the Circuit Court of Cook County, Illinois, accepted bribes from his co-defendant, Pasquale F. DeLeo, an attorney, in exchange for favorable treatment in a case pending before Shields. That case, as it turns out, was one of a series of mock cases filed by federal agents investigating corruption in the Illinois courts. Much of the evidence against both Shields and DeLeo was obtained by the government by means of electronic monitoring equipment which it installed in Shields' chambers pursuant to an order issued by then acting Chief Judge James B. Moran on August 29, 1988. Shields has moved to suppress the evidence obtained through electronic surveillance and to dis-

miss the superseding indictment, contending, *inter alia*, that authorization for the surveillance was based upon materially false information which the government had submitted in support of its application to bug Shields' chambers. For the reasons set forth below, Shields' motions to suppress and dismiss are denied.[1]

## II. FACTS

The fictional lawsuit which the government used as the vehicle for its undercover investigation was filed in the Chancery Division of the Circuit Court of Cook County, Illinois, on July 12, 1988. The case, *Nichols v. Wilson*, Case No. 88 CH 6337, was assigned by lot to Shields. (*See* Indictment ¶ 1(e).) Robert J. Cooley, an attorney cooperating with the Federal Bureau of Investigation ("FBI"), assumed the role of the plaintiff's attorney in this contrived suit. Beginning just prior to the date the *Nichols* case was filed and continuing through the months of July and August, 1988, Cooley allegedly engaged in a series of conversations with Patrick Marcy, secretary of Chicago's First Ward Democratic Organization and defendant DeLeo about the possibility of either persuading Shields to rule favorably to Cooley's fictitious client or having the case assigned to another judge who could be so persuaded. These conversations were consensually monitored by means of a body recording device attached to Cooley's person. Based upon the evidence which it gathered through Cooley in the months of July and August, the government on August 29, 1988, submitted an application to Judge Moran for permission to intercept oral conversations from Shields' chambers pursuant to the provisions of the federal wiretapping statute, 18 U.S.C. § 2518.

The government submitted the 17–page affidavit of FBI Special Agent John S. Bowen in support of its application. According to the affidavit, Bowen had been detailed to the Chicago field office of the FBI for the prior four years, and during that time had been assigned to investigate judicial corruption exclusively. (Bowen Aff. ¶ 3.) In his affidavit, Bowen laid out the background of the government's ongoing investigation in connection with the *Nichols* suit, and detailed the evidence which the government had gathered to date through Cooley.

Many of the particular representations that Bowen made in his affidavit have been set forth in detail below; consequently, a lengthy summary is not required here. Briefly, Bowen asserted that although Marcy ultimately had been unable to offer Cooley any assistance in securing a favorable disposition of the *Nichols* suit, DeLeo had represented to Cooley on August 16, 1988, that he could arrange to fix the case by passing along money to Shields. (Bowen Aff. ¶ 8D.) According to the affidavit, Cooley and DeLeo had agreed upon a figure of $2,500 to be paid to Shields in exchange for a favorable ruling upon a motion for an injunction that Cooley intended to bring in the immediate future. (*Id.*)[2] Bowen further represents that Cooley and DeLeo met the following day, at which time DeLeo scheduled a meeting with Shields on the morning of August 19, 1988, prior to the hearing which had been set for later that morning on Cooley's motion for a temporary restraining order in the *Nichols* case. (*Id.* ¶ 8E.)

The hearing allegedly went forward on August 19. According to Bowen, Cooley

1. DeLeo has filed a brief motion broadly invoking many of the same arguments Shields has raised in his own motions to suppress and dismiss. Because DeLeo does not raise any arguments different from those Shields has articulated, there is no need to address DeLeo's motion independently. The Court denies his motion on the same grounds that it denies Shields' motions.

2. Bowen's affidavit reveals that the fictional parties to the *Nichols v. Wilson* suit were partners

in a financial management firm. (Bowen Aff. ¶ 8A.) According to the complaint filed in the case, the defendant (Wilson) had improperly withdrawn $350,000 from partnership funds and deposited them in his own account. (*Id.*) The complaint sought ultimate relief in the form of an order requiring defendant to return these funds, and interim relief in the form of an injunction preventing the defendant from moving the funds from the personal account to which he had deposited them. (*Id.*)

met with DeLeo that morning outside Shields' courtroom and at DeLeo's request paid him $2,500 on the representation that DeLeo would take it to Shields. (Bowen Aff. ¶ 8F.) DeLeo then allegedly left Cooley and walked through the courtroom toward the hallway leading to Shields' chambers. (*Id.*) He allegedly returned moments later, informing Cooley that Shields would not accept the money until after he had ruled upon Cooley's motion. (*Id.*) According to Bowen, an *ex parte* hearing on Cooley's motion subsequently went forward before Shields, who granted the request for a temporary restraining order. (*Id.*) By its terms, the order purportedly would expire on August 29, 1988. (*Id.*)

According to Bowen's affidavit, Cooley and DeLeo met again on August 24, 1988. (Bowen Aff. ¶ 8G.) At that time, Bowen represented, the two discussed Cooley's intention to appear before Shields on August 29 and request a continuance of the temporary restraining order. (*Id.*) DeLeo purportedly encouraged Cooley to have his client present, assuring Cooley that he would make sure Shields ruled in Cooley's favor. (*Id.*) Bowen further represented that DeLeo instructed Cooley to call him on the morning of August 29, 1988, and indicated that he would arrange to meet with Shields prior to the hearing that day. (*Id.*) According to Bowen, DeLeo indicated to Cooley that Shields was content with the $2,500 he had been paid, and recommended that Shields be paid an additional "two bits," which Cooley took to mean another $2,500. (*Id.*)

Bowen's affidavit reports that Cooley appeared before Shields on August 29, 1988, in the *Nichols* case, and at that time a representative of the fictional defendant requested a continuance until the following day. (Bowen Aff. ¶ 8I.) Shields allegedly granted the request. (*Id.*) Cooley and DeLeo spoke later that day, according to Bowen, and DeLeo indicated he would see Shields prior to the time Cooley was due back in court on the following day. (*Id.*) Cooley intended to present a request to extend the temporary restraining order when he next appeared before Shields, Bowen represents; and Cooley planned to

meet with DeLeo beforehand and pay him $2,500 in exchange for a favorable ruling on the request. (*Id.*)

Having set forth these factual assertions, Bowen stated his belief that conversations would occur between Shields and DeLeo in Shields' chambers on August 30, 1988, prior to the scheduled hearing in the *Nichols* case that day. (Bowen Aff. ¶ 8I.) Bowen anticipated that the two men would discuss the disposition Cooley wanted as well as the money received from Cooley, and that DeLeo would deliver the bribe to Shields at that time. (*Id.*)

On the evening of August 29, 1988, Judge Moran granted the government's application for leave to begin monitoring oral conversations within Shields' chambers. The authorization order which Judge Moran signed reflected his findings that there was probable cause to believe that: (1) Shields and DeLeo had committed and were committing offenses involving the interference with commerce by extortion and the conspiracy to do so, in violation of 18 U.S.C. § 1951, and racketeering, in violation of 18 U.S.C. § 1962; (2) oral communications concerning these offenses, in particular communications regarding the solicitation and receipt of bribes to influence the handling of civil cases pending in the Circuit Court of Cook County, Chancery Division, would be intercepted from Shields' chambers; and (3) Shields' chambers had been and were being used by defendants in connection with these offenses. (Aug. 29, 1988 Order Authorizing Interception of Oral Communications at 1–2, ¶¶ A, B, D.) Judge Moran also found that "[n]ormal investigative procedures have been tried and failed to achieve all of the objectives of the investigation, reasonably appear unlikely to succeed if continued, or are too dangerous." (*Id.* at 2, ¶ C.)

## III. ANALYSIS

### A. *Legal Standards*

Shields and DeLeo have filed their motions to suppress pursuant to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18

U.S.C. § 2510, *et seq.*, and *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Defendants contend that the affidavit which the government submitted in support of its application to conduct electronic surveillance of Shields' chambers contained material misstatements and omissions, and that absent these misrepresentations and omissions, probable cause to support the surveillance was lacking. *See generally id.* at 155–56, 98 S.Ct. at 2676.

■■■ The Supreme Court's opinion in *Franks* sets forth the general framework governing a Fourth Amendment challenge to the validity of a search warrant which the defendant contends was issued on the basis of factual misrepresentations:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155–56, 98 S.Ct. at 2676. *See also United States v. McNeese*, 901 F.2d 585, 593–94 (7th Cir.1990). Omissions from the affidavit are evaluated on the same basis. *Id.* at 594. Thus:

> The omission of a fact from an affidavit is material only if it amounts to deliberate falsehood or reckless disregard for the truth. Mere negligence by the affiant does not constitute reckless disregard for the truth. Nor is an omission material if, in context, the information was of such minimal significance that its

omission could not reasonably have affected the magistrate's [or the judge's] judgment in finding probable cause to search.

*Id.* (citations omitted). The Seventh Circuit has applied this same framework to motions to suppress the fruits of electronic surveillance authorized under Title III. *See United States v. Williams*, 737 F.2d 594, 602 & n. 5, 604 (7th Cir.1984), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

■■■ Within this framework, the defendant's initial burden is to make a "substantial preliminary showing" that the affidavit submitted in support of the government's warrant application was materially misleading. *See* 438 U.S. at 155, 98 S.Ct. at 2676. As the Supreme Court stressed in *Franks*, this burden is not minimal:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn · or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

438 U.S. at 171, 98 S.Ct. at 2684. *See also McNeese*, 901 F.2d at 594 ("[defendant] must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard"). Moreover, even where the defendant has succeeded in proffering evidence which substantiates his contention that the affidavit contained deliberate misrepresentations or omissions, the Court need not invariably grant the

defendant an evidentiary hearing on the motion to suppress. Rather, the misstatements or omissions must be material; that is, they must have been necessary to the finding of probable cause underlying the warrant.

> A substantial preliminary showing that the affidavit contained reckless or deliberate falsities and omissions must be followed by a substantial showing that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause.

*Id.* at 596, citing *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684. *See also id.* at 156, 98 S.Ct. at 2676; *United States v. Muhammad*, 928 F.2d 1461, 1464–65 (7th Cir.1991).

Having reviewed defendants' motions as well as Agent Bowen's affidavit with these requirements in mind, the Court finds that Shields has not made a substantial showing sufficient to require a *Franks* hearing. As set forth below, the most Shields is able to demonstrate is that in certain instances, Bowen made representations which were mistaken. Even this conclusion, however, requires one to indulge Shields in certain assumptions. More importantly, Shields has come forward with no evidence tending to show that the purported inaccuracies amounted to deliberate or reckless misrepresentations on Bowen's part. To the extent there are any discrepancies in Bowen's affidavit, they are not of such magnitude that they give rise to an inference of a disregard for the truth, nor has Shields submitted any additional evidence from which such an inference could be drawn. In sum, the most one can glean from Shields' objections is a showing of minor negligence in certain isolated instances.

This falls far short of what is required in order to merit a *Franks* hearing. *See* 438 U.S. at 171, 98 S.Ct. at 2684; *McNeese*, 901 F.2d at 594.[3]

However, even if the Court were to assume that defendants had succeeded in establishing that Agent Bowen's affidavit did contain deliberate false statements or omissions, it nonetheless would conclude that these statements or omissions, taken either individually or together, are immaterial. In other words, the Court finds that stripped of the purported misstatements and supplied with the purported omissions, the Bowen affidavit would nonetheless have been sufficient to supply probable cause for the electronic surveillance in this case. *See Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85; *McNeese*, 901 F.2d at 594. The Court's findings as to each of the asserted misrepresentations and omissions are set forth below. In addressing in detail each of the many objections Shields has made to the affidavit, the Court does not mean to suggest that it entertains any doubt that the affidavit, viewed as a whole, amply supports Judge Moran's determination of probable cause. *See* n. 3, *supra*. Rather, the Court has undertaken a thorough review of Shields' objections merely in order to afford the defendants the benefit of every reasonable doubt. *But see Muhammad*, 928 F.2d at 1465 (doubtful cases should be resolved in favor of upholding warrant).

B. *Purported Misrepresentations and Omissions*

1. Shields' purported satisfaction with money

▓ Shields initially attacks Paragraph 8G of Bowen's affidavit, contending that it

---

**3.** In essence, the challenge Shields mounts to Bowen's affidavit represents an attempt to hide the forest by magnifying its individual trees. This approach to probable cause determinations is inconsistent with the standard of review set forth in *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). *Cf. United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir.) ("Appellants engage in a 'divide and conquer' attack on the affidavit, and urge this court to undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole. We decline this

invitation to review the affidavit in an overly stringent and hypertechnical fashion."), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir.1986) ("Such emphases typify the 'excessively technical dissection of informants' tips' and the "judging [of] bits and pieces of information in isolation against * * * artificial standards' against which the Supreme Court cautioned in *Gates* and [*Massachusetts v. Upton*, 466 U.S. 727, 732, 104 S.Ct. 2085, 2088, 80 L.Ed.2d 721 (1984) ].").

"sets forth a blatant misrepresentation on perhaps the most crucial point in the affidavit—that DeLeo allegedly had personal knowledge that Shields took a bribe to fix the *Nichols* case and was satisfied with the amount of the bribe." (App. at 2.[4]) In full, Paragraph 8G states:

> On August 24, 1988, CW had a consensually monitored conversation with DeLeo. DeLeo recommended that CW have his client in court on August 29, 1988, when CW would be seeking an extension of the temporary restraining order. DeLeo said that if CW had his client there, he (DeLeo) would make sure that Judge Shields ruled in CW's favor. DeLeo also told CW to call him at 9:00 a.m. on August 29, 1988 and DeLeo would go to see the judge before the 11:00 a.m. hearing. *DeLeo also indicated that the judge was satisfied with the $2,500 paid on August 19, 1988.* DeLeo also recommended that the judge be paid an additional "2 bits" (believed by CW to mean $2,500) for any subsequent action taken by the judge. Based upon these statements, affiant believes DeLeo paid the bribe money to Shields sometime between August 19, 1988 and August 24, 1988.

(Emphasis supplied.) According to Shields, the representation that DeLeo had told Cooley that Shields was satisfied with the $2,500 he had received was an outright fabrication. In Shields' view, this was a misrepresentation which was critical to the success of the government's application to bug Shields' chambers, for it was offered to establish DeLeo's personal knowledge that Shields had accepted a bribe. Stripped of this misrepresentation, Shields contends, the Bowen affidavit contains nothing more than evidence of "boasting and larceny by trick on the part of DeLeo"; and without it, Shields further asserts, Judge Moran would not have granted the government's Title III application. (App. at 4.)

In response, the government contends that Bowen's statement was a completely accurate representation of what Cooley had told him. Thus, after Bowen discussed the August 24 meeting with Cooley, he wrote in an FBI 302 that "Smith [Cooley] advised that DeLeo also indicated that the Judge was satisfied with the last $2,500 payoff." (Bowen 302, dictated Aug. 24, 1988/transcribed Aug. 31, 1988.[5]) Because the "last $2,500 payoff" as of the August 24 meeting was the one Cooley had [allegedly] made on August 19, 1988, the government contends, Bowen's affidavit was true to what Cooley had recounted of his conversation with DeLeo. (Gov.Mem. at 36.) The only basis for Shields' argument to the contrary, the government further argues, lies in the transcript of this conversation. The initial draft of this transcript reported the following exchange:

> COOLEY: Alright, but I mean, with him, was he happy with what I gave him before.
>
> DELEO: Yeah
>
> COOLEY: Ok, as long as he's happy that's the, you know the main thing.

(Draft Transcript at 4, Tape No. 170, Aug. 24, 1988.)[6] Shields maintains that the word "Yeah" cannot be heard on the tape. The government concedes that point and has revised the transcript to indicate that DeLeo gave no response which is audible on the tape. But the dispute about the

---

4. Shields has submitted a memorandum of law in support of his motion to suppress; attached to the memorandum as an appendix is an offer of proof outlining in greater detail his objections to individual statements and purported omissions in Bowen's affidavit. The Court has cited to the memorandum as "Mem. at _____," and to the offer of proof as "App. at _____."

5. As the government notes, the Court may consider the content of the 302 forms in determining whether a *Franks* hearing is necessary. *See United States v. Costello*, 610 F.Supp. 1450, 1460–64 (N.D.Ill.1985) (Roszkowski, J.), *aff'd without published opinion*, 830 F.2d 195 (7th Cir.1987) (considering content of 302s in ruling upon motion to suppress evidence obtained through electronic monitoring of judge's chambers in Operation Greylord prosecution). Shields has cited each of the 302s referred to in this opinion as evidence he would present at an evidentiary hearing regarding the accuracy of Bowen's affidavit.

6. In instances where the Court has quoted from the transcripts, it has endeavored to make the quotes verbatim. Because the transcripts are replete with errors of punctuation and grammar, these errors will reappear here.

accuracy of the transcript has nothing to do with the accuracy of Bowen's affidavit, the government maintains. The transcript had not been prepared at the time Bowen's affidavit was executed, and the affidavit does not purport to quote DeLeo as if the transcript had been prepared. (Gov.Mem. at 37.) Finally, the government maintains that to the extent that the revised transcript indicates that DeLeo made no audible response to Cooley's inquiry regarding the judge's satisfaction with the money previously paid to him, it does not call the veracity of Bowen's affidavit into question. According to the government, Cooley never stated nor did Bowen represent that DeLeo had orally confirmed Shields' contentment with the payoff; the affidavit simply states that DeLeo had "indicated" Shields was satisfied. (Gov.Mem. at 37–38.) Moreover, assuming that Cooley had reported to Bowen that DeLeo had given an oral response to his question, it would not have been improper for Bowen to rely upon that report and so represent in his affidavit. (*Id.* at 38, citing *United States v. McDonald,* 723 F.2d 1288, 1293 (7th Cir.1983), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984).)

Having reviewed Bowen's affidavit, his form 302 summary of Cooley's account of the August 24 encounter with DeLeo, and both the tape and transcripts of this encounter, the Court agrees that Shields has made no showing of a reckless or deliberate falsity which would entitle him to an evidentiary hearing. Bowen's representation that "DeLeo also indicated that the judge was satisfied with the $2,500 paid on August 19, 1988" does not depart in any manner from the 302 summary Bowen prepared after debriefing Cooley. Thus, assuming the accuracy of the 302, there is no suggestion that Bowen misrepresented the version of the conversation that Cooley had given him. Nor does the tape recording of the conversation between DeLeo and Cooley suggest that Cooley, let alone Bowen, had misrepresented the import of the ex-

change between the two. Having listened to the recording, the Court agrees that one cannot discern from it an audible response to Cooley's question about Shields' satisfaction. However, given the imperfections of body recording devices and the occasionally transient quality of the recordings, the inability to hear a response on the tape does not exclude the possibility that a faint oral response not picked up by the recording device was nonetheless given; nor does it exclude the possibility that DeLeo may have answered the inquiry with a some form of nonverbal response.[7] Indeed, the context of the conversation suggests that DeLeo did give some sort of affirmative response. Thus Cooley goes on to remark (without subsequent correction or contradiction from DeLeo), "Ok, as long as he's happy....." Of course, it remains for the jury to decide, after hearing both Cooley's testimony about the conversation and the recording of it, what DeLeo actually indicated to Cooley. However, the record as it now stands suggests that Bowen's summary of the August 24 exchange between DeLeo and Cooley was entirely faithful to what transpired. Furthermore, Shields has brought forward no evidence which suggests that Bowen recklessly or deliberately misrepresented the conversation.

**2. DeLeo's statement to Cooley suggesting Shields was corrupt**

■ Shields' next objection focuses upon Paragraph 8D of Bowen's affidavit. In relevant part, that paragraph states:

> On August 16, 1988, the CW engaged in a consensually monitored conversation with DeLeo at which time DeLeo clearly stated, after being told that the case was assigned to Judge David J. Shields, that he could assist in fixing the case. DeLeo indicated that *"the judge will do whatever you want, all he is worried about is getting the money."*

(Emphasis supplied.) Shields contends that the quote is a fabrication, employed by

---

**7.** Shields' challenge to this aspect of the affidavit is based solely upon the lack of an audible response on the tape to Cooley's inquiry regarding the previous payment. Shields does not

contend that DeLeo failed to respond in some other, nonverbal way to the question. (*See* App. at 3–4.)

Bowen in order to suggest that DeLeo knew, presumably from past experience, that Shields would accept bribes. (App. at 5.)

In response, the government terms this objection as "the case of the out-of-place quotation mark." (Gov.Mem. at 38.) The government concedes that DeLeo did not use the word "money" when he was describing to Cooley what it was that Shields purportedly cared about. (*See id.* at 40.) Indeed, as the transcript of the conversation referred to in this paragraph reflects, and as the Court's own review of the tape recording of the conversation confirms, what DeLeo and Cooley appear to have said to one another is as follows[8]:

> DELEO: Okay lets do this. I'll tell you the best way with Dave, okay? What's the first step? The first step is to get the injunction right?
>
> COOLEY: Well we want, I wanna make sure though, I wanna make sure Pat if I do something. In other words I don't wanna do something before this guy and get started and you can't move the case. I think, I think anytime.
>
> DELEO: *No, he'll do whatever we want. all he's wan ... worried about is this.* That's what I'm saying and you know and you, you know how, what to do.
>
> COOLEY: Okay.

(Transcript at 3–4, Tape No. 163, Aug. 16, 1988) (Emphasis supplied.) Bowen was plainly aware that DeLeo had not used the word "money" in this exchange, for in the Form 302 summary he prepared regarding this conversation, he wrote:

> DELEO told SMITH[9] [COOLEY] that "The judge will do whatever you want, all he is worried about is getting the money." SMITH stated that DELEO did not utter the word "money" but instead

indicated the judge's concern about the money by making the hand motion of rubbing his fingers together.

(Bowen 302, dictated Aug. 18, 1988, Transcribed Aug. 25, 1988.) However, the government argues that the inaccuracy is limited to one word ("money"), a word which accurately reflects the tenor of what DeLeo actually said ("this") and did (rubbed his fingers together). Shields offers no alternate construction of DeLeo's statement and gesture, the government observes[10]; moreover, in its own view, the notion that DeLeo was talking about money is confirmed by the remainder of the conversation:

> DELEO: Tell me what the first step is to get the injunction. That'll lock up the money.
>
> COOLEY: That's the first thing you wanna do right?
>
> DELEO: (IA). I'll approach him and ask him, Judge here I got this case you know, we're getting into it. It's very important ah, here's what I wanna do. The first thing I wanna do is lock up the money by getting an injunction.
>
> COOLEY: Once we do that we're, I think we're basically home free.
>
> DELEO: And then right then and there I'll take care of him on that.
>
> COOLEY: Okay.
>
> . . . . .
>
> DELEO: Yeah what is, the first step is to get the injunction. You want me to talk to him first.
>
> COOLEY: Yeah definitely. I, I wanna make sure.
>
> DELEO: (IA) write (IA).
>
> COOLEY: I wanna make sure that he doesn't play games. I wanna make

---

**8.** For purposes of the pending motions to suppress, the Court has assumed that the tape recordings are authentic, and that the speakers have been accurately identified by the government in the transcripts which it has prepared. Ultimately of course, these are matters for the jury to decide, and the Court does not undertake to make any findings here upon such questions. Beyond certain specific objections as to the accuracy of the transcripts, however, the defendants have not raised any general challenges to the authenticity of either the transcripts or the

tape recordings, nor have they contended that the Court may not assume that the speakers have been correctly identified.

**9.** The government's Form 302s identify Cooley as "ERIC SMITH".

**10.** Shields does not dispute the government's representation, based upon Bowen's 302, that DeLeo had made the gesture with his fingers.

sure that you know I don't go in there and have him hem or haw or Hedge.

DELEO: No he won't play games.

COOLEY: Because the moment we do it this guy will glam with the money.

DELEO: You just tell me what you want to do with it.

COOLEY: Well the main thing is to get an injunction...

. . . . .

DELEO: Just got to motion it up.

COOLEY: We motion it up? Well let me see whats what then and ah, ah I'll give you a call and ... alright.

DELEO: But all you got to do is tell me what you want me to give him

COOLEY: Alright you tell me whats fair.

DELEO: I don't know.

COOLEY: Yeah.

DELEO: I know. You know all I want to do, all I want to do is lock him up.

COOLEY: Theres big bucks involved in it.

DELEO: You tell me what you want to do.

COOLEY: Theres big bucks involved.

DELEO: You tell me what you wanna do.

COOLEY: Well you tell me whatever is fair to start.

DELEO: I don't care. It don't make any difference.

COOLEY: Alright give me a normal number.

DELEO: I have no idea.

COOLEY: I've never done anything before in the civil area.

DELEO: I have no idea.

COOLEY: So numbers I, I don't care what the numbers are. You know if it's worthwhile.

DELEO: I don't know.

COOLEY: If I, if I can walk in and look at the star.

DELEO: He'll do it, he'll do it like this.

COOLEY: Okay.

DELEO: Okay. He'll do anything. You tell me what you want me to give him.

COOLEY: How about, how about 2500?

DELEO: Fine.

COOLEY: Alright? Then let me get the motion ready to go in. I'll see you in a day or two and I'll get you then.

DELEO: (IA)

COOLEY: Okay?

DELEO: Okay. No problem.

. . . . .

(Transcript at 4–9.) The government maintains that DeLeo's use of phrases such as "I'll take care of him" and "all you got to do is tell me what you want me to give him" in this portion of the conversation makes clear that Cooley and DeLeo are talking about money, and thus corroborates the construction Cooley and Bowen had given to DeLeo's earlier statement that "all he cares about is this." What Shields' objection boils down to, the government argues, is that Bowen used quotation marks when he should not have; but the misplaced quotes did not distort the import of DeLeo's remark, nor would the affidavit in its corrected form have been any different substantively.

Bowen's affidavit is misleading to the extent the quotation marks suggest DeLeo actually used the word "money" when telling Cooley what it was Shields purportedly cared about. Yet, the Court finds it significant that Bowen used the word "indicated" in recounting DeLeo's statement. (*See* Bowen Aff. ¶ 8D.) One might reasonably conclude from Bowen's use of that word that his summary of DeLeo's statement to Cooley was merely meant to be an approximation, not an exact quote. That point aside, having reviewed the transcript of the entire conversation and listened to the recording, and taking into account Bowen's 302 summary of what Cooley reported from the conversation, the Court finds any discrepancy from DeLeo's actual statement to be minimal. Shields does not dispute that but for the word "money," Bowen's description of DeLeo's remark is accurate, nor, as the government has pointed out, does Shields suggest that DeLeo meant something other than "money" when he used the word "this" and rubbed his fingers together. Thus, but for Bowen's erroneous use of the quotation marks, the affi-

davit is true to the information set forth in the 302 summary.

Moreover, a reasonable interpretation of the subsequent exchange between Cooley and DeLeo is that the two were discussing how much money should be given to Shields. In this context, although Bowen's affidavit may have misquoted DeLeo, it does not distort the apparent meaning of DeLeo's remark. Indeed, assuming the affidavit had been correctly phrased or punctuated, it would have conveyed the same information to Judge Moran. In other words, the Court finds the deviation between the account of the conversation which Cooley had given to Bowen and Bowen's affidavit in this instance so slight as to have been immaterial. At the same time, the circumstances reflect no evidence that Bowen's summary of the conversation amounted to a reckless or deliberate misrepresentation of fact.

3. Relevancy of Cooley's Alleged Prior Corrupt Dealings with Patrick Marcy

■ In Paragraph 6B of his affidavit, Bowen summarizes prior instances in which Cooley allegedly had bribed members of the judiciary at the behest of Patrick Marcy [11]:

> Prior to cooperating with the government, CW fixed a number of cases at the request of Marcy. One case involved a murder committed by Harry Aleman in approximately 1977. CW paid Cook County Circuit Court Judge Frank Wilson $10,000 in order to fix the case. CW obtained the money from Pat Marcy. Aleman was found not guilty by Wilson in a bench trial. Another case involved a murder involving members of a Chinese organization known as the On Leong. CW served as courier for bribe money from New York members of the On Leong to Marcy and Chicago First Ward Alderman Fred Roti. A third case, in 1985, involved an attempted murder charge against a defendant named Michael Collella. The victim was a Chicago police officer. While CW was attempt-

ing to negotiate a plea in the case, Marcy contacted CW and told him to try the case because it had "already been taken care of." The defendant was subsequently acquitted in a bench trial before Cook County Circuit Court Judge Lawrence Passarella.

Shields contends that this information is completely irrelevant to the question of whether or not Shields was corrupt and was likely to discuss bribery with DeLeo in his chambers, and was included in the affidavit merely to prejudice Judge Moran.

This objection is without merit, for several reasons. First, it is an objection which is misplaced in the immediate context, for it suggests no deliberate or reckless falsity. Second, to the extent it represents a contention that the government improperly presented irrelevant information in support of its Title III affidavit, it ignores the role of the judge in evaluating that affidavit. As an experienced and neutral arbiter of the affidavit's sufficiency, Judge Moran was more than able to differentiate between information which was relevant to the probable cause determination and information which was merely extraneous. Only to the extent he was presented with false or distorted evidence would Judge Moran's ability to evaluate the merits of the Title III application have been impaired, and, as already noted, this is not the objection which Shields makes here. Finally, Cooley's purported history of endeavors to bribe other members of the judiciary was not completely irrelevant, as Shields contends. In any case in which the government seeks leave to conduct a search or electronic surveillance based in part upon information obtained from or through an informant or cooperating witness, the credibility and experience of this individual are, if not dispositive, certainly relevant. Evidence that Cooley previously had engaged in the type of illicit conduct which the government was attempting to expose tends to lend credibility to the observations and interpretations Cooley reported to the government and at the same time renders

---

**11.** Marcy is named as a defendant in a separate indictment pending before Judge Marvin E. As-

pen of this district. *United States v. Marcy,* Case No. 90 CR 1045.

it somewhat more likely that individuals such as Marcy and DeLeo would have known and accepted Cooley as an accomplice in corruption. Thus, reference to Cooley's prior forays into judicial bribery was not improper, nor does it call into question Judge Moran's determination of probable cause.

### 4. Omission of exculpatory statements by Marcy regarding the possibility of bribing Shields

■ Bowen's affidavit recounts a series of three conversations between Cooley and Marcy in July, 1988, shortly after the *Nichols v. Wilson* case was filed, in which they discussed whether the case could be reassigned to another judge or, in the alternative, whether Shields could be influenced to dispose of it favorably. Paragraphs 8B and 8C describe these conversations as follows:

> B. On July 14 and 21, 1988, the CW engaged in consensually monitored conversations with Pat Marcy in regard to the status of his, Marcy's, attempts to have the case reassigned to Judge [A] or if possible influence Judge David J. Shields to render a favorable disposition of the matter. Marcy had previously indicated to CW that he could try to have the case reassigned to a favorable judge if the original assignment was not a favorable one. Marcy had also previously indicated that he could help CW on any case CW requested help. Marcy is not an attorney, nor does he have any lawfull [sic] authority to cause a case to be reassigned.
>
> C. On July 26, 1988, the CW engaged in a consensually monitored conversation with Marcy at which time Marcy indicated that he would not be able to do anything on the case because "the court system was just too hot right now and everybody's scared." CW told Marcy he would talk to someone else about the case, and Marcy recommended that CW do that.

Shields argues that Bowen distorted the nature of these conversations (and several others between Marcy and Cooley, to which Bowen makes no reference) in several ways: by omitting certain key statements by Marcy which were exculpatory to Shields, by inventing one quote and by distorting others in order to give them a "sinister cast," and by omitting the exculpatory conclusion which should be drawn from the conversations. (App. at 7.)

In order to assess the propriety of Bowen's representations, it is necessary to quote at length from each of the conversations in question. The first took place on July 11, 1988, just before the *Nichols* case was filed. After Cooley describes the facts underlying the case to Marcy, he asks Marcy about the possibility of having the case assigned to a favorable judge:

> MARCY: Where's this go who's hearing this?
>
> COOLEY: ... about, I'm gonna, it hasn't been assigned yet. I'm gonna go file it in the next day or two and it has, it has to be filed in Chancery. Is there any chance of gettin the thing to [A].[12] Any chance of gettin the case to him?
>
> MARCY: [A] who?
>
> COOLEY: [A]. Isn't he in Chancery he's in Chancery isn't he?
>
> MARCY: Yeah but now it goes through computers.
>
> COOLEY: I mean it must be, there's no way ...
>
> MARCY: There is no way, no.
>
> COOLEY: There's no way to get around it?
>
> MARCY: No.
>
> COOLEY: Well it, it ...
>
> MARCY: All we can do, let me, let me know where it's goin' and then let me go from there.
>
> COOLEY: See if, if we file now, if we file and we don't like the judge we have ten days to SOJ ["Substitution of Judge"]. Once we SOJ, can we do something?

---

**12.** The recording and transcript in this instance reflect the name of a judge who is not the subject of an indictment. The Court has deleted this individual's name in deference to privacy concerns. The same procedure will be employed at trial.

MARCY: Can't do it. I don't know let me find out.

COOLEY: You see, I got, I got twenty thousand from the guy already up front.

MARCY: Let's see where it goes Bob.

COOLEY: Ok.

MARCY: I, I ain't gonna bullshit you but if we can handle the guy fine, if we can't I'm gonna tell you about it.

COOLEY: There's no way to get around the machine though.

MARCY: No way, I tried that a year ago.

(Transcript at 1–2, Tape No. 155, July 11, 1988.) The conversation subsequently concluded with Cooley promising to give Marcy a call. Cooley saw Marcy on July 14, 1988, and informed him that the case had been assigned to Shields:

COOLEY: We got Judge Shields. DAVID SHIELDS.

(Kids playing in background)

MARCY: I wouldn't go near him with a ten foot pole.

COOLEY: Ok.

MARCY: But I'll tell you let me find out. (ui) putz around with it.

COOLEY: See I've got 10 days.

MARCY: (ui) Let me talk to somebody another Judge.

COOLEY: Ok.

MARCY: Let me pick his brain and see what he does.

COOLEY: Ok.

MARCY: ... Uh today is Thursday, I'll see this guy Monday, you see, call me Tuesday and I'll tell you whether he is friendly or whether he's (IA).

COOLEY: Ok good.

(Transcript at 1–2, Tape No. 157, July 14, 1988.) Marcy and Cooley spoke again on July 19, 1988, but Marcy had no information for Cooley:

COOLEY: Any news?

MARCY: No not yet.

COOLEY: Okay well.

MARCY: I got some guy working on it.

(Transcript at 1, Tape No. 161, July 19, 1988.) On July 21, 1988, Marcy still had no news:

MARCY: Bob, I'm waitin for ... this afternoon give me a call. I'll find out.

COOLEY: Ok.

(Transcript at 1, Tape No. 159, July 21, 1988.) Cooley telephoned Marcy later that day:

MARCY: Yeah. I talked and he's still trying ... still trying.

COOLEY: Okay.

MARCY: (Inaudible) so we'll see.

COOLEY: Okay well so we got until like ah Tuesday to ah to make a move.

MARCY: Well if you don't hear from me by Tuesday make it.

COOLEY: Okay PAT.

MARCY: Cause I don't think he's bullshitten he says I'm still trying maybe over the weekend he said.

COOLEY: Well I'll check with you then for sure on Monday, then I'll decide what I'm gonna do.

(Transcript at 1, Tape No. 162, July 21, 1988.) Cooley called Marcy as promised on the following Monday, July 25, 1988:

COOLEY: Any news at all?

MARCY: No, no.

COOLEY: Oh.

MARCY: I gotta talk to ... these guys are scared shitless.

COOLEY: Okay.

MARCY: I'll talk to you about that.

COOLEY: Okay.

MARCY: Alright.

(Transcript at 1, Tape No. 167, July 25, 1988.) Cooley and Marcy met the following day:

MARCY: What happened?

COOLEY: No I mean uh, no good news huh?

MARCY: This guy scared to death. What got the guys talkin to (ui) he

says Pat you know what you askin, I know what I'm askin' you. These guys today ain't the right time to talk to these guys. They don't know what's comin' up they bringin' guys in they brought some guys in some judges that got brought back in.

COOLEY: From out of town you mean.

MARCY: Yeah bringing 'em in so they, they're scared to death.

COOLEY: I got somebody else that maybe can get it moved.

MARCY: Who?

COOLEY: Another guy I'm gonna go see now ...

MARCY: Go ahead.

COOLEY: ... and this guy told me he can maybe get it moved anybody in particular might be good.

MARCY: Well

COOLEY: Otherwise its there's no sense in me if you know (ui) ... if somebody's for sure.

MARCY: I don't know what to tell you.

. . . . .

COOLEY: I was told until, until you do something before a judge you can still SOJ him and that's why I haven't gone in to get my process server appointed, but my client's on my back now to do something and I can't, I'm not telling him what's going on, I'm not gonna say nothing to him, I just want to try and see if we can do, if we can't do something no sense in my even trying though. If everybody's nervous then there's no sense ...

MARCY: I don't know what to tell you, I don't you got me out in the woods.

COOLEY: Alright then you know ...

MARCY: And I'm not gonna fuck around these guys and I know they're gonna flip if they squeeze their neck a little.

COOLEY: Yeah.

MARCY: I don't need that shit.

COOLEY: Exactly. Ok.

MARCY: Alright.

COOLEY: Then I'll you know see what's, maybe I'll try on the up and up I might even try that. (laughing)

MARCY: You know that's very possible.

COOLEY: No but I'm just saying its a uh, its a touch and go situation I'd like to have but if we can't uh, if we can't get help we can't get help.

MARCY: If I hear anything I'll reach out for you.

COOLEY: Ok.

(Transcript at 1–2, Tape No. 160, July 26, 1988.) With the content of the conversations between Marcy and Cooley having now been laid out, the Court can turn to Shields' objections to the manner in which Bowen described them in his affidavit.

Shields's first contention is that Bowen's summary is misleading because it omits statements which are exculpatory to Shields. Shields notes that Bowen's affidavit makes no mention of the July 11, 1988, conversation between Cooley and Marcy, in which Marcy stated (1) that there was no way to get around the computerized case assignment system, and (2) that "I ain't gonna bullshit you but if we can handle the guy fine, if we can't I'm gonna tell you about it." The affidavit also does not report Marcy's comment on July 14, 1988, that he wouldn't go near Shields "with a ten foot pole." The import of these statements, Shields suggests, was that "some judges were simply honest and could not be bribed," and that Shields was one of these judges (App. at 10–11); indeed, Cooley himself later told DeLeo that "Pat [Marcy] says Shields can't be talked to" (Transcript at 3, Tape No. 163, Aug. 16, 1988.) By failing to mention these statements in Bowen's affidavit, Shields argues, the government falsely implied that Shields could be bribed, when the omitted statements actually indicated the opposite. (App. at 11.)

Shields next challenges several of the representations in Bowen's affidavit which he contends were either inventions or distortions of what Marcy had in fact said to Shields. The first objection in this regard concerns Bowen's representation that on July 26, 1988, "Marcy indicated that he would not be able to do anything on the case because 'the court system was just too hot right now and everybody's scared.'" (Bowen Aff. ¶ 8C.) Nowhere on the tape

recording of this conversation does Marcy actually use these words, and Shields contends that Bowen fabricated the quote to imply that in Marcy's view, Shields could not be bribed to fix the *Nichols* case only because of heightened scrutiny of the Cook County courts rather because of a principled unwillingness on Shields' part to accept bribes. (App. at 12.)

Shields' second objection argues that the affidavit distorts Marcy's remarks about Cook County judges being scared by implying that Marcy was in direct contact with Shields, when in fact the particular words Marcy used ("these guys are scared shitless"; "[t]hese guys today ain't the right time to talk to these guys"; "they're scared to death"; "I'm not gonna fuck around these guys"; "I know they're gonna flip if they squeeze their neck a little"; "[t]hey don't know what's comin' up" (July 26, 1988); "[l]et me talk to somebody another Judge" (July 14, 1988)) indicate that Marcy was not dealing with Shields at all. (App. at 12–13.) Indeed, Shields argues, the emphasis of the conversations between Cooley and Marcy was not upon trying to bribe Shields, but upon trying to have the case reassigned to another judge who could be bribed. (*Id.* at 13.)

Third, Shields asserts that the government, in order to further impugn Shields and corroborate DeLeo's boasts that he could bribe Shields, falsely suggested to Judge Moran that Cooley and Marcy had discussed someone other than Marcy who might be able to bribe Shields. Shields contends that this is the clear implication of Bowen's representation that "CW told Marcy he would talk to someone else about the case, and Marcy recommended that CW do that." (Bowen Aff. ¶ 8C.) In fact, Cooley told Marcy that he had "somebody else that maybe can get it moved," and that "anybody in particular might be good," indicating, in Shields' view, that he simply knew someone who could help him get the case reassigned. (App. at 13.)

Finally, Shields complains that the government purposely crafted Bowen's affidavit in such a way as to fend off the exculpatory conclusion which Judge Moran would have drawn from an accurate portrayal of the conversations between Marcy and Cooley. The government went to great lengths in Paragraph 6 of Bowen's affidavit to stress Marcy's ability to corrupt members of the judiciary, Shields contends, yet the conversations between Marcy and Cooley reveal that Marcy was unable to bribe Shields. DeLeo, in contrast, was "small potatoes." (App. at 14.) In Shields' eyes, there is only one conclusion to be drawn from these conversations: "if Marcy, who the government contended was a master fixer, could not fix the case, there is no way that Pat DeLeo could fix the case." (*Id.*) Only by intentionally distorting what Marcy had told Cooley, Shields argues, was the government able to prevent Judge Moran from reaching this same conclusion. (*Id.*)

With respect to the first argument concerning the omission of exculpatory information, the government relies upon *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990), for the proposition that "omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." The government also argues that the conclusion which Shields distills from the purportedly omitted statements—that DeLeo could not fix the case if the more skilled Marcy could not—is "nonsense". (Gov.Mem. at 43.) In the government's view, an official's reluctance to accept a bribe from one individual does not rule out the possibility that he might be more willing to deal with someone else. At the same time, the government asserts, statements like Marcy's—"I wouldn't go near him with a ten foot pole"—are not exculpatory. Proof that Shields would not take money from Marcy is not proof that he would not accept a bribe from DeLeo, and the thrust of Bowen's affidavit was that surveillance of Shields' chambers would reveal DeLeo bribing Shields. (*Id.*) Moreover, Marcy's statement was merely an expression of personal opinion, the government points out, and one which would not have influenced Judge Moran's decision. (*Id.* at 43–44.)

With respect to Shields' charge that Bowen manipulated Marcy's statements to ren-

der them incriminating, the government contends that Shields has completely misread the affidavit. Bowen did not attribute to Marcy any statement connoting a corrupt relationship between Shields and himself, the government notes. (*Id.* at 44 & n. 21.) Indeed, according to the government, Bowen's affidavit made clear that Cooley and Marcy had simply discussed two options: (1) having the case reassigned to another judge whom Marcy knew to be cooperative or (2) influencing Shields, *if that were possible.* (*Id.* at 44, citing Bowen Aff. ¶ 8B.) Bowen's representation that Marcy had said "the court system was just too hot right now and everybody's scared" (Bowen Aff. ¶ 8B) was plainly not an implicit reference to Shields, the government argues; and to the extent that it was not an exact quote, it was nonetheless an accurate paraphrase of Marcy's statements. (*Id.* at 45–46.) In sum, the government contends, Bowen accurately described Cooley's discussions with Marcy as to the possibility of fixing the *Nichols* case. The affidavit hid no exculpatory evidence from Judge Moran, and did not falsely portray these explorations as incriminating of Shields. (Gov.Mem. at 41–46.)

The Court has carefully reviewed each of the transcripts reflecting the meetings between Cooley and Marcy, and finds that Bowen's affidavit contains no significant misrepresentations or omissions concerning those meetings. The affidavit accurately summarizes the thrust of the conversations as well as the outcome. In this Court's view, no misimpression was conveyed to Judge Moran.

The affidavit is not wanting on the ground that it omitted exculpatory information. In the first instance, none of the statements which Shields contends should have been included are truly exculpatory. The most helpful among the lot is Marcy's statement that he wouldn't go near Shields "with a ten foot pole." One way to interpret this statement is that Marcy believed Shields would not accept a bribe. But certainly there are other ways to construe this statement. Ultimately, the government is correct in observing that the statement is nothing more than an expression of Mar-

cy's opinion. Other statements, such as Marcy's promise to be candid with Cooley as to whether the judge assigned to the *Nichols* case could be bribed, taken in context might also suggest that Marcy came to the conclusion that he could not bribe Shields. Marcy's explanation that there was no way around the computerized case assignment system did nothing more than squelch whatever notion Cooley may have had about getting Marcy to rig the case assignment; it does not reflect upon the character of any judge, including Shields. Plainly, Cooley did strike out with Marcy, but that outcome is quite clear from Bowen's affidavit. None of the omitted statements would have added anything of substance to the affidavit, for they supplied no relevant information as to whether or not DeLeo would be able to bribe Shields.

Moreover, whatever slight exculpatory quality the omitted statements may have possessed, their omission does not call the adequacy of Bowen's affidavit into question. In *Colkley, supra,* 899 F.2d at 302–03, the Fourth Circuit rejected the defendant's argument that the Fourth Amendment imposed a duty upon the government to disclose potentially exculpatory evidence when it applied for a warrant. The court articulated three reasons for its holding, which this Court finds persuasive. First, although *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), imposes a duty upon the government to reveal exculpatory evidence which might have an impact upon a verdict, the *Brady* rule applies in the trial setting, where the defendant enjoys a presumption of innocence and a due process right to a fair trial. 899 F.2d at 302. Probable cause determinations, however, are merely preliminary, and do not carry with them ramifications commensurate with an ultimate adjudication of guilt or innocence. *Id.* Second, whereas *Franks* requires a showing that information was deliberately or recklessly misrepresented or withheld from the judge issuing the warrant, *Brady* eschews inquiry into the prosecutor's intent and focuses solely upon the materiality of the information. Because warrant applica-

tions are made at an early stage of the proceedings when it may be difficult to assess whether or not a given piece of information is exculpatory, it may be unreasonable to import into this context the broad duty of disclosure which *Brady* imposes. *Id.* at 303. Third, reading a *Brady* obligation into the Fourth Amendment "would severely disrupt the warrant process." *Id.*

> The rule would place an extraordinary burden on law enforcement officers, who might have to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory evidence had been excluded. It would perforce result in perniciously prolix affidavits that would distract police officers from more important duties and render the magistrate's determination of probable cause unnecessarily burdensome. In addition, a broad duty of inclusion would turn every arrest or search into a warrant contest. Such consequences would, in turn, discourage reliance on warrants, a result the Supreme Court has stated should be avoided in shaping Fourth Amendment doctrine.

*Id.* (citation omitted). *Colkley* itself acknowledges that there may be instances in which it preliminarily appears that the government deliberately withheld exculpatory information material to the probable cause determination, thus requiring a *Franks* hearing. 899 F.2d at 303. This was not one of those instances, given Bowen's essentially accurate summary of the Cooley–Marcy encounters and the immaterial nature of the omitted details which Shields has cited. Absent such a showing, a *Franks* hearing cannot be compelled on the ground that the government failed to disclose potentially exculpatory information when it sought the warrant.

█ Nor is a *Franks* hearing required on the ground that Bowen intentionally distorted the content of Cooley's conversations with Marcy, for there is no evidence of such distortion in Bowen's affidavit. The first purported instance of misrepresentation that Shields has cited is at worst another example of the misplaced quotation mark. As is evident from the tapes and transcripts of the July 25 and 26 exchanges between Cooley and Marcy, Marcy never said " 'the court system was just too hot right now and everybody's scared.' " (Bowen Aff. ¶ 8C.) To the extent Bowen's affidavit suggests that Marcy used these exact words, it conveys a misimpression. Yet, once again, the context of Bowen's statement need not be read this way. As with the earlier objection involving Bowen's use of quotation marks, his concurrent use of the word "indicated" reasonably may be construed as a signal that the subsequent passage enclosed within the quotation marks was intended as a paraphrased version of what the speaker said rather than a verbatim quote. Even if one indulges in the presumption that Bowen meant to convey the impression of an exact quote, the deviation from Marcy's exact words is of no import. The statements Marcy actually made (*e.g.*, "these guys are scared shitless"; "today ain't the right time to talk to these guys"; "they're scared to death") convey the same idea that Bowen's paraphrased version does—that the judges who might otherwise be willing to cooperate with Marcy were presently too nervous to do so. Thus, the Court finds it highly unlikely that Judge Moran was at all misled as to the content of Marcy's remarks.

Shields' suggestion that Bowen's affidavit was crafted in such a way as to imply that Marcy was speaking of Shields in particular is completely off base. In summarizing Marcy's report of the jitters his contacts were having, Bowen nowhere uses Shields' name, or even a singular pronoun such as "he" or "him". Bowen's actual statement is worth repeating: "Marcy indicated that he would not be able to do anything on the case because 'the court system was just too hot right now and everybody's scared.' " (Bowen Aff. ¶ 8C.) To read this statement either as implying that Marcy had been in touch with Shields or as saying *anything* about Shields in particular (let alone that Shields would be willing to accept a bribe but for the present air of nervousness) requires quite a leap of

the imagination. Shields has shown no basis for attributing such a leap to Judge Moran, nor for attributing to Bowen the intent that Judge Moran make such a leap.[13]

Equally implausible is Shields' suggestion that when Bowen wrote, "CW told Marcy he would talk to someone else about the case, and Marcy recommended that CW do that" (Bowen Aff. ¶ 8C), he intended to mislead Judge Moran into thinking that Cooley and Marcy had discussed someone in particular who might be able to bribe Shields. As the transcript of the July 26 meeting reveals, Bowen's statement is completely true to the actual exchange between Cooley and Marcy on this subject. Nothing in the affidavit can be construed to suggest either that Marcy and Cooley discussed anyone by name, or that the particular individual to whom Cooley had referred would be able to bribe Shields. Once again, there is no hint of deliberate or reckless misrepresentation.

Having disposed of the individual objections Shields has raised with respect to this portion of the affidavit, the Court similarly must dismiss Shields' objection to the overall thrust of Bowen's summary. There is no ground to argue, as Shields does, that Bowen misrepresented the discussions between Marcy and Cooley so as to hide the ultimate outcome—Marcy's inability to do anything for Cooley. Bowen did not hide from Judge Moran the fact that Marcy, the purported "master fixer," could not bribe Shields. To the contrary, that fact is made quite plain in Bowen's affidavit. (*See* ¶ 8C.) Accordingly, assuming that there was any exculpatory value in this scenario, Judge Moran had the full benefit of it in determining whether DeLeo, whom Shields characterizes as "small potatoes," was able to accomplish what Marcy apparently could not in this instance.[14]

5. Failure to acknowledge that Judge Salerno had previously denied accepting bribes from DeLeo

Shields contends that the Bowen affidavit is also misleading when it reports that former Circuit Court Judge Frank Salerno had acknowledged taking bribes from DeLeo without mentioning that Salerno had previously denied doing so. The relevant portion of Bowen's affidavit states:

Former Cook County Circuit Court Judge Frank Salerno has been cooperating since his guilty plea to judicial corruption charges in October 1987. Salerno advised that during the years 1983 through 1985 he regularly received money from attorney Pat DeLeo in return for favorable rulings on DeLeo's cases and in return received an envelope from DeLeo containing from $300–$1,000 per month. This arrangement continued until February of 1985 when Salerno was removed from Licensing Court after media reports that he was under investigation in Operation Greylord.

(Bowen Aff. ¶ 7.) Shields contends that this information was included in the affidavit in order to bolster the credibility of DeLeo's representations to Cooley that he could bribe Shields. (App. at 15.) Yet, the

13. Even if Bowen's affidavit could be read to imply that it was Shields who was "scared," the implication would not be completely without support in Marcy's own statements on the subject. As set forth above, when Cooley met Marcy on July 26, 1988, one of Marcy's first remarks was "*This guy* scared to death." (Transcript at 1, Tape No. 160, July 26, 1988) (Emphasis supplied.) From the context of this conversation and those which preceded it, one might reasonably infer that Marcy was speaking of Shields when he made this statement. Of course, the Court expresses no opinion as to whether such an inference would be accurate, and merely notes it to emphasize the absence of any impropriety in Bowen's summary of Marcy's remarks.

14. As noted above, the fact that Marcy was unable to influence Shields does not rule out the possibility that someone else, in particular DeLeo, might be able to do so. Notwithstanding the contrast which Shields attempts to draw between Marcy and DeLeo (the "master fixer" versus "small potatoes"), the admissions of former judge Frank Salerno and members of the Chicago Police Department Licensing Unit that they had accepted bribes from DeLeo in the past (*see* Bowen Aff. ¶ 7) tend to indicate that DeLeo was as able to influence members of the judiciary as Marcy.

government failed to mention that during an extensive proffer which Salerno made to the government in May of 1987, prior to his guilty plea, Salerno had twice denied accepting any bribes from DeLeo, a fact purportedly reflected on FBI summaries of the proffer.[15] In one instance, Salerno represented that he knew DeLeo as an attorney who practiced in Licensing Court and had sold DeLeo tickets to political fundraisers, but denied having accepted money from him in exchange for favorable treatment from the bench. On another occasion, Salerno provided a list of people who had either paid bribes to him, shared bribes with him, or accepted bribes from him. DeLeo evidently was not on this list. The FBI was aware of this "explosive evidence" at the time Bowen's affidavit was prepared, but Shields maintains that mention of it was deliberately omitted in order to bury the inconsistency in Salerno's representations, to avoid the accompanying loss of credibility, and thus to mislead Judge Moran. (App. at 16–17.)

The government contends that there was nothing improper in the failure to mention Salerno's prior inconsistent statement. Similar omissions have been upheld in other cases, the government notes, and here the omission does not call into question Judge Moran's determination of probable cause. The government represents that when he recanted upon his initial denial that he had taken bribes from DeLeo, Salerno indicated he had feared for the safety of himself and his family. Moreover, the fact that Salerno had implicated DeLeo in the course of cooperating with the government after his own conviction and sentencing was clear from Bowen's affidavit. Consequently, the government contends, it may be assumed that Judge Moran understood there was a basis upon which to impeach Salerno's credibility. (Gov.Mem. at 46–48.)

The Court perceives nothing "explosive" in Salerno's prior denial of bribe-taking from DeLeo, and finds that the omission of

this information was immaterial. Salerno's prior statement certainly is impeaching, but the contention that the government should routinely include impeachment material in warrant applications implicates concerns identical to those which militate against a requirement that the government include all exculpatory information in such applications as well. The Fourth Amendment envisions a search for probable cause, not guilt beyond a reasonable doubt. Prior inconsistent statements may be material in the trial setting, but they need not routinely be included in a warrant application. Certainly this was not a situation in which the witness' prior statement was material to the determination of probable cause. As the government notes, the First Circuit so concluded in *United States v. Rumney* 867 F.2d 714, 720 (1st Cir.), *cert. denied*, 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989), finding that "[the witness'] credibility was not undercut merely because he made predictable denials until the police could produce evidence linking him to the robbery." Here, Shields suggests that Salerno's first statement was likely more reliable than his subsequent recantation, because after sentencing Salerno had a greater motive to help himself out by pointing the finger at others. (App. at 17.) Yet, the opposite could be argued just as forcibly, for any defendant facing sentencing or even simply facing charges may wish to improve his standing in the eyes of the government and the court by exposing the wrongdoing of others. The bottom line is that nothing in Salerno's about-face necessarily suggests that one statement or the other was more likely correct. Moreover, to the extent that Salerno had an incentive to fabricate at the time he incriminated DeLeo, this was implicit in the disclosure that he had been sentenced and was now cooperating, as the government contends. "After all, we expect ... judicial officers to be only neutral and detached—not naive and ingenuous." *United States v. Reivich*, 793 F.2d 957, 963 (8th Cir.1986). Thus, the

---

**15.** Shields indicates that he is prepared to present the FBI 302 reports which reflect Salerno's statements at an evidentiary hearing. These 302s have not been submitted to the Court. However, for present purposes, the Court has assumed that Shields has accurately portrayed their contents.

court in *Reivich* concluded that the government's failure to mention the promises of leniency the police had given to their informants were not material to the probable cause determination, where the magistrate who issued the warrant had been made aware of their arrests, and thus "could easily have suspected and taken into account the typical kind of bargaining involved here." *Id.*, citing *People v. Kurland*, 28 Cal.3d 376, 392–94, 168 Cal.Rptr. 667, 677–78, 618 P.2d 213, 223–24 (1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981).

### 6. Misrepresentation of Cooley's former affiliation with DeLeo's Law Firm

■ In the portion of his affidavit introducing Cooley, Bowen represented that Cooley had been associated with DeLeo's law firm. Shields contends that this is "pure fiction," designed to portray Cooley as someone close to DeLeo and thus unlikely to be the victim of mere boasting on DeLeo's part. (App. at 17.) In relevant part, the affidavit states:

> ... The CW, prior to cooperating with the federal government, has made payoffs to judges and other court personnel. A number of these payoffs have involved cases dealing with organized crime figures. The CW became acquainted with these individuals approximately 15 years ago when he established a friendship with now Illinois State Senator, John D'Arco, Jr., the son of John D'Arco, Democratic Committeeman for the First Ward of Chicago.
>
> As a result of the friendship with D'Arco, the CW was asked to join the law firm of Kugler, DeLeo & D'Arco. During his association with the firm, the CW became acquainted with Patrick Marcy, the secretary for the First Ward Democratic Organization. Marcy is an associate of DeLeo and both D'Arco's.
>
> . . . . .
>
> The CW advised that he broke away from the law firm approximately five to six years ago when he determined that he was losing business because the firm was utilizing attorneys working for the City of Chicago's Corporation Counsel's Office to take care of the firm's business while they were on City time. The firm was able to utilize this City office because of the influence exerted [sic] over Anthony Bertuca, Chief of Traffic Division, of the Corporation Counsel's Office by Patrick Marcy and John D'Arco, Jr., who the CW believes were responsible for putting Bertuca in the position. The CW still maintains a good relationship with the firm, especially with Pat DeLeo, and continues to receive referrals from them.
>
> CW has had numerous conversations with DeLeo during which DeLeo discussed his activities while serving as a Chicago Corporation Counsel in Licensing Court. DeLeo was still associated with the law firm while working as a corporation counsel. These conversations occurred while CW was still associated with the law firm. DeLeo discussed how he would pay off licensing police officers, and how he would accept payoffs from vending machine owners. CW observed a number of licensing police officers in the law office. On certain occasions, DeLeo would tell CW to be the attorney for the defendant in Licensing Court cases, while DeLeo would serve as prosecutor. DeLeo would often then dismiss the case.
>
> . . . . .

(Bowen Aff. ¶¶ 6A, 6C, 6D.) Shields represents that his counsel have obtained "irrefutable evidence," which they would present at an evidentiary hearing, that Cooley was never a member of DeLeo's law firm, that he never shared offices with the firm, and that DeLeo had not even referred a case to Cooley for at least eight years prior to the date of Bowen's affidavit.

The government's initial response to this challenge is that Shields' promise of irrefutable evidence is not enough; rather, Shields must either present that evidence or provide a satisfactory excuse for his inability to do so in order to obtain a *Franks* hearing. Next, the government contends, Shields makes no argument that Bowen knew of the inaccuracy. Finally, in

the government's view, any error on this point was immaterial, for even absent a formal business relationship between Cooley and DeLeo's law firm, the affidavit supplies other information which discounts the possibility that DeLeo was simply "scamming" Cooley. For example, the affidavit reveals that Cooley and Marcy, an associate of DeLeo's, previously had engaged in bribery together; and it further reveals that other officials, *e.g.* Judge Salerno, had taken bribes from DeLeo.

The Court agrees that Shields has not met his burden of proof as to this aspect of the affidavit. Shields has not provided so much as a clue as to what his "irrefutable evidence" is, let alone detail it in an affidavit as he must. Nor has Shields made a proffer of this evidence or tendered an explanation for his inability to submit the evidence itself. In such a circumstance, a deliberate or reckless falsity cannot simply be assumed. *See Franks,* 438 U.S. at 171, 98 S.Ct. at 2684; *United States v. McDonald, supra,* 723 F.2d at 1294 ("the defendant must do more than construct a self-serving statement which refutes the warrant affidavit"); *United States v. Costello,* 610 F.Supp. 1450, 1462 (N.D.Ill.1985) (Roszkowski, J.), *aff'd without published opinion,* 830 F.2d 195 (7th Cir.1987) (defendants' contention at oral argument that they could prove, contrary to warrant affidavit, that judge never sat in gambling court did not suffice to require *Franks* hearing). *See also United States v. Pace,* 898 F.2d 1218, 1227–28 (7th Cir.1990).

■ Moreover, as Judge Roszkowski emphasized in *Costello,* "In order to overcome *Franks'* presumption of validity and make the requisite preliminary showing, a defendant must provide *substantial evidence* that the affiant knew his allegations to be false, that he actually entertained substantial doubts as to the truth of the information, or that he had obvious reasons to doubt its veracity." 610 F.Supp. at 1460 (emphasis in original), citing *United States v. Reed,* 726 F.2d 339, 342 (7th Cir.1984). Shields has made no attempt to show that Bowen knew Cooley had not been associated with DeLeo's firm or had reason to

doubt the representation that he had been. This failure constitutes a second ground on which Shields' argument fails. Finally, assuming the representation was inaccurate, eliminating it from the affidavit would not undermine the government's demonstration of probable cause. "Probable cause requires only a 'fair probability,' and not a certainty...." *Reivich,* 793 F.2d at 960. Shields continually insists that DeLeo was simply "rainmaking," taking money from Cooley without any intent or ability to carry through on his boasts that he could bribe Shields. This is a theory for the jury, however. Although Bowen's affidavit may not have portrayed DeLeo as an honest, upstanding citizen whose word may be taken at face value (*see* Shields Mem. at 10, citing *Illinois v. Gates, supra,* 462 U.S. at 233, 103 S.Ct. at 2330), nothing in his alleged history of corruption necessarily required the government to dissolve all suspicion that DeLeo simply may have been "scamming" Cooley. Indeed, DeLeo's purported experience in bribery might be read to bestow credibility upon his representations regarding Shields. In any case, to the extent circumstances tending to rule out the possibility of a scam bolstered the probable cause determination, the purported tie between Cooley and DeLeo's firm was not critical. As the government has maintained, there were other circumstances set forth in the affidavit which tended to show that DeLeo was not simply boasting about the ability to bribe a judge. (*See* Bowen Aff. ¶¶ 6B, 7.) Accordingly, even if the Court were to assume without foundation that Bowen's representation concerning Cooley's affiliation with the firm constituted a deliberate or reckless misrepresentation, it surely was not one which was material to Judge Moran's determination of probable cause.

### 7. Misrepresentations regarding Cooley's statements purportedly inculpating Shields

■ Shields' last specific objection concerns Paragraph 9 of the affidavit, in which Bowen discusses the adequacy of alternatives to the electronic monitoring for which

the government was seeking authorization. In pertinent part, that paragraph states:

. . . . .

CW is willing to testify and has provided and will continue to provide direct evidence as it concerns Pat F. DeLeo. However, as has been indicated in this affidavit, CW has not been able to obtain and provide direct evidence of Judge David J. Shields soliciting and accepting bribes from Pat F. DeLeo and others as yet unknown. CW has not and probably will not be in a position to make contact with Shields when Shields is soliciting and accepting bribes because, from my experience and from the experience of other Special Agents of the Federal Bureau of Investigation, high-ranking corrupt officials, such as judges, insulate themselves from direct exposure to the unlawful payments. Therefore, even with the assistance of CW, all of the offenders could not be identified.

. . . . .

I know from my experience and the experience of other Special Agents of the Federal Bureau of Investigation that the use of an undercover agent in this instance is unlikely to succeed. Shields appears to be very careful not to take bribes from a lawyer if a third party is present. Moreover, although CW is well known to Shields, *Shields appears unwilling to permit CW entrance to his corrupt circle.* New lawyers would have great difficulty gaining Shields' confidence, therefore, an undercover agent posing as a corrupt attorney is unlikely to be able to gain Shield's [sic] confidence such that Shields would engage in criminal transactions in his presence.

(Bowen Aff. ¶ 9) (Emphasis supplied.) Shields attacks the highlighted passage because, in his view, it assumes that Shields in fact had a corrupt circle, that Cooley knew about it, and that Cooley had attempted unsuccessfully to gain admission. (App. at 18.) This was a distortion of the record, Shields argues, because although Cooley had known Shields for years, he had no first-hand knowledge that Shields was

corrupt; in fact, as far as he knew, Shields was an honest judge. (*Id.* at 18–19.)

The government argues that Shields has again misconstrued Bowen's affidavit. Bowen does not attribute any statement or belief that Shields was corrupt to Cooley, it notes. Rather, a fair reading of the affidavit reveals that it was Bowen who had concluded, based upon the circumstances previously summarized, that Shields was corrupt. Moreover, the propriety of Bowen's rhetorical reference to Shields' "corrupt circle" aside, it was not offered in support of probable cause, the government observes. Instead, the statement is included in the section of Bowen's affidavit regarding the necessity of electronic surveillance. Thus, whatever challenge Shields might mount to the accuracy of the statement is moot, for it had no bearing upon Judge Moran's assessment of probable cause.

Shields' attack on Bowen's statement does miss the mark. As the government has noted, the location of the statement within the affidavit belies any contention that it was offered as "evidence" in support of probable cause. Further, it is plain both from the wording and the context of the statement that it was merely Bowen's characterization. The statement attributes nothing to Cooley, but merely reflects Bowen's conclusion that Cooley would not be permitted direct access to Shields. Finally, and perhaps most importantly, to suggest that an experienced judge like Judge Moran would have been misled by Bowen's statement defies all reason. Bowen was clearly drawing conclusions based upon his experience and the information he had obtained in the course of this investigation, and this fact is clear from the context and tenor of Bowen's remarks.

### 8. Bowen's state of mind

█ In light of the foregoing series of purported misrepresentations in the affidavit, Shields maintains that Bowen intentionally slanted his affidavit in such a way as to manufacture probable cause to believe Shields was engaged in corrupt activity. "An experienced agent, such as Bowen ...

had to know ... that DeLeo might well be working the oldest scam around a courthouse: *larceny by trick;* the selling of a phony fix." (App. at 19) (Emphasis in original.) Thus, Shields posits, Bowen set out to rewrite the facts in order to discount that probability. Over and above the alleged misrepresentations and omissions discussed above, a "shocking falsehood" included in a second affidavit submitted in the government's subsequent application for renewal of the Title III authorization evinces an intent to deceive, according to Shields. That affidavit describes two conversations between Shields and DeLeo which had been intercepted in Shields' chambers on August 31, 1988 and September 2, 1988. At the August 31, 1988 meeting (when, according to the indictment, DeLeo paid Shields $2,500), according to Bowen's affidavit, DeLeo "made the statement 'here's your cut.' " (Bowen Aff. Sept. 27, 1988 ¶ 7.) Shields contends that this statement was fabricated.

The government simply responds that Shields is wrong, contending that although Shields's counsel may not be able to hear this statement on the tape, Bowen is not the only person who can. Moreover, in the government's view, it defies logic to suggest that Bowen would offer up a false quotation that he surely knew would later be exposed by the tape recording of the conversation. According to Shields' scenario, the government contends, "[s]uddenly the agent who so cleverly deluded Judge Moran in the manner of Lex Luthor began to act like Barney Fife." (Gov.Mem. at 51.)

Setting aside the plausibility of Bowen inventing this quotation, the Court agrees that there is no evidence that he did so. As it has in every other instance in which there has been an objection either to the accuracy of the transcript or to Bowen's characterization of a conversation, the Court has listened to the pertinent tape recording. This particular conversation between Shields and DeLeo is at times difficult to hear, and this no doubt explains why the government's transcript of the conversation does not include the "here's your cut" statement. Nonetheless, having reviewed the recording, and recognizing that there is room for disagreement, the Court is satisfied that a reasonable person could discern this statement on the tape. Accordingly, there is no evidence that Bowen did anything but faithfully report what he actually heard DeLeo say in that conversation.

It should be apparent from the disposition of this objection and each of the others Shields has raised that the Court finds no merit to Shields' contention that Bowen engaged in either intentional or reckless distortions in the affidavits he submitted to Judge Moran. At the very worst, the current record reveals only arguable mistakes in the affidavit, none of which were material to the probable cause determination. Shields' attempt to attribute Machiavellian motives to Bowen fails completely. There is no need in this instance for a *Franks* hearing, and the defendants' request for one is denied. *See Costello,* 610 F.Supp. at 1460, 1464.

## C. *Showing of Probable Cause*

■ As a prerequisite to an order authorizing electronic surveillance, Title III requires a federal judge to find probable cause to believe that an individual is committing or has committed a crime and that the surveillance will intercept communications concerning this activity. 18 U.S.C. § 2518(3)(a) and (b). Shields contends that Bowen's affidavit failed to establish such probable cause and that Judge Moran therefore erred in authorizing the government to monitor his chambers. The standard which governs review of probable cause determinations is set forth in *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. 2317. There the Supreme Court embraced a "totality of the circumstances test":

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court

is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. *Jones v. United States*, 362 U.S. [257], at 271, 80 S.Ct. [725], at 736 [4 L.Ed.2d 697 (1960)].

462 U.S. at 238–39, 103 S.Ct. at 2332.

Shields contends that *Gates* does not govern Title III determinations, because the statute was enacted prior to the Supreme Court's decision in *Gates* and was intended to incorporate the traditional standard of probable cause. (Shields Mem. at 5 n. 3.) However, as Shields prudently points out, the Seventh Circuit has applied *Gates* without qualification in Title III cases. *See United States v. Zambrana*, 841 F.2d 1320, 1332–33 (7th Cir.1988); *United States v. Williams, supra*, 737 F.2d at 602 n. 5, 604. Moreover, at least four other circuits have explicitly rejected the contention that Title III demands a more compelling showing than ordinary warrant applications. *See, e.g., United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir.) ("affidavits in support of electronic surveillance orders are to be judged by the same standards as conventional search warrants; the statutory probable cause standards set out in Title III are co-extensive with the constitutional requirements embodied in the fourth amendment"), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 342 (1988); *see also United States v. Talbert*, 706 F.2d 464, 467 (4th Cir.1983); *United States v. Fury*, 554 F.2d 522, 530 (2d Cir.), *cert. denied*, 433 U.S. 910, 931, 97 S.Ct. 2978, 2831, 53 L.Ed.2d 1095 (1977); *United States v. Falcone*, 505 F.2d 478, 481 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975). In any event, the Supreme Court's endorsement of the "totality of the circumstances" test in *Gates* simply marked a return to an "analysis that traditionally has informed probable cause determinations." 462 U.S. at 238, 103 S.Ct. at 2332. Thus, the *Gates* test is perfectly consistent with the "traditional" standard of probable cause which Congress purportedly meant to adopt when it enacted Title III (Shields Mem. at 5 n. 3.), and this is the test the Court will apply here.

Before considering whether Bowen's affidavit meets the probable cause inquiry called for by *Gates*, the Court must dispose of Shields' contention that the government was required to demonstrate, and Judge Moran was required to find, more than a "fair probability" of unearthing wrongdoing through the surveillance. Shields argues that because the subject of the surveillance in this case was a judge, a "fair probability" of unearthing wrongdoing is not enough. Starting with the premise that "[j]udicial independence ... is a bed-rock principle of the concept of the rule of law," (Shields Mem. at 6), Shields goes on to suggest that in order to establish probable cause to monitor his chambers, the government was required to show, and Judge Moran was required to find, that it was "substantially more probable than not" that the surveillance would disclose evidence of a crime (*id.* at 7).

This is a most disquieting invitation. The Court has no quarrel with the notion that an independent judiciary is crucial to our system of justice. But there is a distinction to be made between independence and impunity, and the line of demarcation cannot be drawn more generously for judges than it is for other citizens. The vitality of an adversarial system which calls upon its litigants to zealously advocate their own interests depends perhaps more than any other upon a judiciary which is free from all hint of corruption. Judges must not be held above those whom they judge in the investigation of wrongdoing; the same quantum of proof which allows the constable to walk through the door of a family's home suffices to permit entrance to a judge's chambers.

Any notion that the separation of powers doctrine calls for a different standard was laid to rest in *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.) (per curiam), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). There the court of appeals rejected former governor and circuit judge Otto Kerner, Jr.'s contention that the constitution and separation of pow-

ers forbade his trial on bribery charges unless and until he had been impeached:

> We conclude that whatever immunities or privileges the Constitution confers for the purpose of assuring the independence of the co-equal branches of government they do not exempt the members of those branches "from the operation of the ordinary criminal laws." Criminal conduct is not part of the necessary functions performed by public officials.

*Id.* at 1144. This rationale applies with full force here. The office of judge does not supply its holder with greater protection from police scrutiny than the Fourth Amendment provides to others. As the court noted in *Isaacs:*

> All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.
>
> It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

493 F.2d at 1143, quoting *United States v. Lee,* 106 U.S. 196, 220, 1 S.Ct. 240, 261, 27 L.Ed. 171 (1882). *See also United States v. Claiborne,* 727 F.2d 842, 845 (9th Cir.), *cert. denied,* 469 U.S. 829, 105 S.Ct. 113, 83 L.Ed.2d 56 (1984); *United States v. Hastings,* 681 F.2d 706, 711 (11th Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983).

■ Bowen's affidavit meets the "fair probability" test outlined in *Gates.* One might reasonably read the affidavit to establish, *inter alia:* that Cooley and DeLeo had bribed judges and other public officials on prior occasions; that Cooley and DeLeo had both engaged in this activity with Marcy and other members of Chicago's First Ward power structure; that DeLeo had told Cooley he could bribe Shields; that DeLeo had taken $2,500 from Cooley for the express purpose of bribing Shields to rule favorably in the *Nichols v. Wilson* suit; that DeLeo appeared to have met with Shields just prior to the hearing on August 19, 1988; that Shields had granted Cooley's motion for a temporary restraining order; and that on August 24, 1988, DeLeo had indicated to Cooley that Shields was satisfied with the money that Cooley had provided previously and had proposed to Cooley that they give Shields an additional "two bits" in exchange for a favorable ruling at the next hearing scheduled for August 29, 1988. Under these circumstances, the Court finds that Judge Moran had a substantial basis for concluding that there was a fair probability surveillance of Shields' chambers would reveal evidence that he was accepting bribes. The Court expresses no opinion beyond this one; the truth of the government's allegations remains a matter for the jury to determine after trial.

### D. *Showing of Necessity*

■ As a further prerequisite to the authorization of electronic surveillance, Title III requires a judge to determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Paragraph 9 of Bowen's affidavit addresses this requirement. In that paragraph, Bowen outlines the alternatives to electronic surveillance normally employed in public corruption cases, including development of informants or witnesses, interviews, physical surveillance, subpoenaing of records, compelled testimony, utilization of search warrants, use of undercover agents, use of pen registers, and information from public records. Bowen then proceeds to outline the reasons why, in his opinion, these options either had already failed or were likely to do so:

(a) Cooley was able to obtain direct evidence against DeLeo and was willing to testify, but likely would not be able to obtain any direct evidence regarding Shields because high-ranking officials such as judges tended to avoid direct receipt of bribes;

(b) It was unlikely the government would be able to obtain evidence through other lawyers, for those who

were most likely to know whether a given judge accepted bribes were the lawyers who had done the bribing, and these individuals would be reluctant to risk disbarment by disclosing their misdeeds;

(c) It was unlikely that evidence could be obtained from court employees, since most held patronage positions and were reluctant to risk them by cooperating with the FBI. Moreover, the evidence which had been obtained from such individuals in the past tended to be nonspecific, due to the secrecy and privacy attending this type of criminal activity.

(d) Although grand jury subpoenas, search warrants, and a review of public records could be used to obtain certain corroborating information, given the wide discretion judges possess, these avenues of investigation were unlikely to yield any hard evidence of judicial corruption;

(e) Physical surveillance had been attempted, but because the key meetings between Cooley and DeLeo took place within the privacy of Shields' chambers, this avenue had failed to yield any direct evidence as to Shields;

(f) Use of an undercover agent would be unlikely to succeed, given that Shields appeared not to accept a bribe in the presence of a third party, Cooley had not been admitted into Shields' "circle" even though he was well known to Shields, and an agent posing as an attorney would be unlikely to gain Shields' confidence.

(Bowen Aff. ¶ 9.) Shields argues that these amount to nothing more than boilerplate assertions of necessity, and that the affidavit fails to address the possibility of using immunity in order to obtain direct evidence against him. If the government believed DeLeo was actually engaging in bribery, Shields posits, it could have granted DeLeo use immunity and forced him to testify against Shields under oath. (Shields Mem. at 11–12.)

The lengths to which Shields has gone to attack DeLeo's credibility elsewhere in his motion to suppress reveals why the option of immunized testimony is inadequate, the government argues. Given that Shields would almost certainly reiterate these attacks at trial, and in light of the government's burden to prove him guilty beyond a reasonable doubt, DeLeo's testimony would not, in the government's view, be an adequate substitute for the evidence which can be obtained through electronic surveillance.

The Court concludes that Bowen's affidavit adequately demonstrated necessity. Shields' sole argument to the contrary presumes that the government could have built its case upon DeLeo's immunized testimony. However, given the nature of the alleged crime involved, the Court agrees that the availability of this option does not undercut the case for electronic surveillance. One might reasonably infer from the evidence Bowen had previously summarized in his affidavit that if Shields were discussing the *Nichols* case with DeLeo and accepting bribe money in exchange for favorable rulings, he was doing so within the confines of his chambers. Although DeLeo appeared willing to relate to Cooley what transpired during his alleged meetings with Shields, quite obviously the government could not be content to rest its case upon DeLeo's immunized testimony.

Indeed, in his attempt to prove deliberate misrepresentations and omissions in Bowen's affidavit, Shields has repeatedly averted to the government's need for evidence corroborating DeLeo's representations to Cooley about Shields. (*See, e.g.*, Shields Mem. at 7 ("the affidavit provides no corroboration for DeLeo's baseless boasts"), 8, 9; App. at 5–6, 11, 14–15, 15, 17, 18–19, 19.) Moreover, in arguing that the affidavit failed to establish probable cause to believe he had engaged in corrupt activity, Shields has directly impugned DeLeo's credibility: "DeLeo is not the 'unquestionably honest citizen' that need not be scrutinized; he is a corrupt lawyer, about whom 'some doubt as to his ... motives' is appropriate."

(Shields Mem. at 10) (citations omitted).[16] At the same time, as the government correctly notes, if DeLeo were to testify under immunity, the Court would instruct the jury to consider his testimony "with caution and great care." *See* 7th Cir. Pattern Instr. No. 3.19. Thus, the need to obtain more direct proof that Shields was engaging in wrongdoing is apparent. *Cf. United States v. Paredes–Moya*, 722 F.Supp. 1402, 1422 (N.D.Tex.1989) (likely attacks upon informant's credibility at trial, coupled with inevitable instruction that testimony of paid informant should be considered with special care, rendered the immunity alternative to surveillance suggested by defendants inadequate), *judgment aff'd in part, rev'd in part on other grounds*, 928 F.2d 665 (5th Cir.1991).[17] Moreover, although Shields attacks in boilerplate fashion Bowen's explanation of the reasons why such evidence could not be obtained without the aid of electronic surveillance, he offers no basis for finding any of the particular reasons Bowen articulated to be immaterial or unpersuasive. Finally, the Court notes that grounds for surveillance quite similar to those offered by Bowen were sustained in the face of far more detailed challenges in *Costello*, 610 F.Supp. at 1468–72. *See Zambrana, supra*, 841 F.2d at 1329 ("Our Circuit recognizes that 'the government's burden of establishing its compliance with [subsection 2518(1)(c)] is not great,' and that the requirement that the government exhaust 'normal investigative procedures' be reviewed in a 'practical and common-sense fashion.'")

### E. *Particularity*

■ In addition to the requirements discussed above, Title III requires that the application identify with particularity "the type of communications sought to be inter-cepted." 18 U.S.C. § 2518(1)(b). The statute likewise requires an order authorizing surveillance to include "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." *Id.* § 2518(4)(c). Shields contends that Judge Moran's order of August 29, 1988, fails to meet the latter requirement because it did not designate the type of communications which were to be intercepted and did not incorporate by reference Bowen's affidavit.[18]

The Court does not find the order defective in this respect. Although the order does not set out in a separate section the nature of the communications sought to be intercepted, that information is nonetheless plainly evident from the text of the order. Paragraph A incorporates a finding of probable cause to believe that Shields and DeLeo were engaging in specified offenses. Paragraph B of the order then goes on to set forth a finding of probable cause to believe that oral communications between Shields and DeLeo regarding certain specified aspects of these offenses would be intercepted. The subsequent provisions of the order which actually authorize the surveillance refer back to these paragraphs, thus providing identification of the nature of the oral communications which were to be intercepted. Indeed, it is difficult to discern what additional information concerning the nature of these communications could have been incorporated from the application, the adequacy of which in this respect Shields does not challenge. (Compare Application ¶¶ C, D(2) with Aug. 29, 1988 Order ¶ B.)

To the extent the order was deficient in this respect, the Court agrees with the government's contention that the deficien-

---

**16.** Such arguments provide an apt example of why this Court does not permit defendants to make blanket adoptions of one another's motions and memoranda, as DeLeo and Shields requested permission to do in this case. (*See* Minute Order dated March 12, 1991) (denying cross-motions to adopt).

**17.** An additional problem with this scenario is that it assumes DeLeo would in fact testify. Although a grant of immunity may eliminate a witness' entitlement to invoke the Fifth Amendment, it does not, in this Court's experience, ensure that the witness will in fact take the stand.

**18.** Shields apparently concedes that the government's application complied with § 2518(1)(b). (*See* Application at 3–4, Ex. A, Shields' Motion to Dismiss Superseding Indictment.)

cy is minimal, and certainly not grounds for suppressing the evidence obtained through surveillance or for dismissing the indictment. At most, any omission amounts to a technical violation of Title III, and Shields has not suggested that he was or is in any way prejudiced by such an omission. Shields does not suggest, for example, that Judge Moran was uninformed or misled as to the type of communications which were to be intercepted, or that the government overstepped the intended scope of the authorized surveillance as the result of any ambiguity in the order. In *United States v. Kirkland*, 705 F.Supp. 1572, 1578 (M.D.Ga.), *judgment aff'd without published opinion*, 893 F.2d 1342 (11th Cir.1989), the court denied a motion to suppress filed on the ground that the order authorizing electronic surveillance contained an ambiguity as to the time period during which surveillance would be permitted. *See* 18 U.S.C. § 2518(4)(e). The court reasoned that while this may have amounted to a technical violation of the order, dismissal was not required:

> [V]iolations which neither directly nor substantially implement Congress' expressed desire to restrain law enforcement's resort to or judicial authorization of the wiretap procedures are not violations which demand a finding that communications intercepted thereunder were unlawfully, intercepted and therefore must be suppressed. The technical violation at issue in the case *sub judice*, the existence of an ambiguity in the judicial order, is not one which has any bearing upon either the government's decision to seek wiretap authorization or a judge's decision to authorize a requested wiretap.

*Id.* at 1578. So it is here. In the absence of any showing that the purported omission or ambiguity in Judge Moran's order significantly implicated the rights Title III was intended to protect, dismissal is not warranted. *See United States v. Donovan*, 429 U.S. 413, 433, 97 S.Ct. 658, 671, 50 L.Ed.2d 652 (1977) (suppression is an appropriate remedy only in instances where failure to satisfy Title III requirements directly implicates congressional intent to limit interception of wire and oral communications to situations which merit this investigative technique).

### F. Constitutionality of Title III as Applied

Shields asserts a one-sentence, boilerplate argument that Title III is unconstitutional, "at least as the statute is interpreted and applied." (Shields Mem. at 13) (footnote omitted.) Absent any articulation whatsoever as to the reasons why the statute might be defective as applied, the Court must dismiss this argument.

### G. Disclosure to the Grand Jury without Approval

Shields' final contention is that the indictment must be dismissed because the government improperly disclosed to the grand jury evidence concerning offenses other than those specified in the order authorizing surveillance. Title III permits individuals who have received information regarding a communication through authorized surveillance to disclose the contents of such a communication while giving sworn testimony in any state or federal proceeding. 18 U.S.C. § 2517(3). However, the statute also conditions such disclosure upon prior court approval when the communication concerns an offense not identified in the order permitting surveillance:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom.... may be used under subsection (3) of this section *when authorized or approved by a judge* of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5) (emphasis supplied). In this case, the authorization order which Judge Moran signed on August 29, 1988, specified two categories of offenses which might be the subject of the oral communications to be intercepted: "offenses involving the interference with commerce by extortion, in violation of Title 18, United States Code, Section 1951, and Racketeering, in violation of Title 18, United States Code, Section 1962."

Shields contends that in seeking an indictment from the grand jury, the government presented evidence regarding oral communications that related to offenses other than these—specifically, evidence regarding the attempt to interfere with commerce through extortion (18 U.S.C. § 1951); interstate travel in facilitation of extortion (18 U.S.C. § 1952); and making false statements regarding matters within the jurisdiction of a federal agency (18 U.S.C. § 1001). These alleged offenses formed the bases for all counts of the indictment with the exception of Count One (conspiracy to interfere with commerce through extortion). Initially, the government did not respond to the merits of Shields' contention, but indicated instead that the issue could be rendered moot by obtaining the requisite authorization, presenting the evidence to the grand jury anew, and obtaining a superseding indictment. (*See* Gov. Mem. at 57–58.) The government obtained authorization from Judge Moran on May 21, 1991, and later that month a new grand jury returned a superseding indictment against the defendants identical in all respects to the original.

Shields contends that the superseding indictment does not cure the violation, because the government failed to seek judicial approval for disclosure regarding the additional offenses until it had already made testimonial use of the evidence in securing the original indictment. In making this argument, Shields relies principally upon *United States v. Arnold*, 773 F.2d 823 (7th Cir.1985). In that case, the government through electronic surveillance had intercepted conversations concerning an offense not specified in the court orders permitting the surveillance. Not until 31 months later, as it prepared to seek an indictment, did the government apply to the district court for authorization to present evidence concerning these conversations to the grand jury. The requisite approval was obtained, but the defendants later moved to dismiss on the ground that the government had violated its duty under Title III to seek such approval "as soon as practicable." The district court denied the motion, and the Seventh Circuit affirmed. The court of appeals rejected the defendants' argument that the duty to seek judicial approval for disclosure arose at the time of the interception, rather than later when the government intended to make testimonial use of the conversations intercepted. *Id.* at 829–30. The court stressed that the post-interception approval requirement § 2517(5) was designed to prevent the government from using authorization to intercept communications concerning one type of crime as a subterfuge to obtain evidence of other crimes for which it lacks probable cause to engage in surveillance. *Id.* at 829.

■ Thus, the analysis which a court must apply in reviewing a post-interception application § 2517(5) for the most part looks backward to the circumstances of the initial order granting the government permission to engage in surveillance; specifically, the court must consider whether the original authorization order was properly obtained, whether it was applied for in good faith and not as a subterfuge, and whether communications of a type not specified in the original order were in fact obtained incidentally. 773 F.2d at 829. In this context, the court reasoned, the length of time between the interception of additional communications and the government's request to make testimonial use of such conversations is immaterial.

The factors that the court must consider must be present at the time the original application was made—i.e., a showing that the original application met the requirements of probable cause, enumerated serious crime and ineffectiveness of other investigatory techniques as to that

offense and further that the application was made in good faith. § 2518. . The mere passage of time between the time of interception and the time of testimonial use does not allow the Government to avoid or evade these factors (probable cause, enumerated crime, ineffectiveness of other investigatory techniques and good faith). Because we fail to understand how the passage of time between the time of interception and the time of testimonial use allows the Government to alter these factors, we hold that requiring the Government to submit a judicial application immediately upon intercepting new crimes evidence is unnecessary to satisfy the purpose of § 2517(5), i.e., to safeguard a defendant from subterfuge searches and we reject the defendants' novel and ridiculous attempt to read into the statute a statute of limitations on testimonial use.

*Id.* at 829. Citing the district court's findings that the original authorization had been properly obtained in good faith and not as a subterfuge, and that the defendants had presented no evidence of prejudice resulting from the delay in seeking post-interception approval under § 2517(5), the court concluded that the government had made its § 2517(5), application " 'as soon as practicable' before testimonial use was made of the intercepted conversations." *Id.* at 830.

■ Because in this case the government sought post-interception approval under § 2517(5) only after it had already made testimonial use of the additional conversations before the grand jury, Shields argues that the government failed to comply with the "as soon as practicable" requirement of the statute. The appropriate remedy, he argues, is dismissal of the entire superseding indictment or, in the alternative, dismissal of Counts Two through Seven, which relate to conversations covered by § 2517(5).

The Court finds dismissal unwarranted under § 2517(5). Assuming that there was a violation of § 2517(5), dismissal of the original indictment might have been an appropriate remedy in light of the government's failure to obtain judicial approval before it presented evidence to the grand jury. *See United States v. Brodson*, 528 F.2d 214 (7th Cir.1975). However, the government has cured the omission by obtaining the approval, returning to the grand jury, and securing a superseding indictment. As Shields contends, this procedure does not undo whatever Title III violation there may have been in the first instance; but like the defendants in *Arnold*, Shields is unable to articulate any way in which the circumstances run afoul of the principles embodied in § 2517(5) or in which his rights have been prejudiced.

Whatever technical violation of the statute the government may have committed, Shields has made no showing that the government has engaged in the type of subterfuge which § 2517(5) was intended to prevent. As set forth in the previous sections of this opinion, the original authorization to monitor Shields' chambers was lawfully obtained upon the requisite showing of probable cause. There is absolutely no evidence before the Court that the government sought that order in bad faith as a subterfuge for broader surveillance than Judge Moran actually authorized. Nor does Shields contend that the oral communications concerning offenses not specified in the August 29, 1988, authorization were obtained other than incidentally in the course of lawful surveillance. In such circumstances, *Arnold* makes clear that the mere delay between the interception of communications regarding additional offenses and approval to make testimonial use of such communications is not a ground to suppress the evidence, for the delay provides no opportunity for the government to evade the requirements of Title III. *See id.* at 829. For the same reason, the fact that the government initially obtained an indictment through improper testimonial use of the conversations is immaterial now that the defect has been cured, for no subterfuge or evasion of the requirements of Title III has been demonstrated. *See United States v. Kerr*, 711 F.2d 149, 152 (10th Cir.1983) (finding no error in use of superseding indictment to

cure previously unauthorized disclosure to grand jury which returned original indictment); *United States v. Vento,* 533 F.2d 838, 856 (3d Cir.1976) (return of superseding indictment after approval for disclosure was obtained mooted issue as to government's failure to obtain such approval prior to seeking original indictment).

Moreover, assuming that the government did make improper testimonial use of conversations concerning offenses not specified in the original authorization order, the Court would note that such conversations necessarily would have overlapped to a great degree, if not completely, with conversations which were within the ambit of that order. Indeed, despite Shields' argument to the contrary, the attempt to interfere with commerce by extortion (Counts Two through Four) *was* an offense specified by the express terms of the August 29, 1988, order; the order does not simply identify "extortion," as Shields represents, but rather "offenses involving extortion," a phrasing which plainly includes attempt. Thus, disclosure of any conversations regarding the attempt charges was not subject to § 2517(5).

As to the remaining counts (Counts Five through Seven), the charges which they set forth do not appear to rest upon different conversations or a different type of underlying conduct, but instead upon matters which have little if anything to do with the type of conversations intercepted. For example, the Travel Act charge in this case (Count Five) stands apart from the other extortion-related charges only in that it rests upon the interstate travel of an undercover FBI agent which was allegedly encouraged by the defendants in furtherance of the bribery scheme. But evidence of the agent's travel was not obtained through the interception of oral communications in Shields' chambers; quite obvious-

ly it was made known to the government through other means. Moreover, the critical conversation supplying the basis for the government's charge that the travel was encouraged by the defendants was consensually monitored through a body recorder attached to the person of the government's cooperating witness, Robert Cooley; it was not obtained through electronic surveillance of Shields' chambers. Likewise, the false statement charges against Shields (Counts Six and Seven) are founded upon statements which Shields allegedly made directly to FBI agents in interviews with them, not upon oral conversations which were electronically intercepted from Shields' chambers. In sum, it does not appear that any of the charges set forth in these three counts uniquely rest upon or implicate conversations intercepted from Shields' chambers. Rather, any of the intercepted conversations which relate to these counts also relate to the charge set forth in Counts One through Four (conspiracy and attempts to interfere with commerce through extortion), offenses which fell within the ambit of the August 29, 1988, authorization. This makes plain that any violation of Title III which the government committed in making testimonial use of the conversations for the purpose of obtaining an indictment on charges other than those specified in the authorization order was purely technical, and in no way effected an end run around Title III's protections or a threat to the defendants' rights.[19] Shields' motion to dismiss the superseding indictment on this ground must therefore be denied.

 Finally, Shields cites two purported defects in the government's post-interception application for disclosure which he contends renders Judge Moran's approval of the disclosure void. Neither need detain

---

19. In *Brodson, supra,* 528 F.2d at 216, the court of appeals concluded that the overlap of approved and unapproved offenses did not excuse the government's failure to comply with § 2517(5). In the court's view, the government's violation of the statute was controlling. *Id.* However, *Arnold* appears to signal a less rigid approach to violations of Title III, emphasizing as it does the purposes of the statute, the

import of the violation, and the prejudice, if any, to the defendant. *See* 773 F.2d at 830–31. The Court believes it consistent with this approach to consider whether and to what extent the charges not identified in the authorization order share an evidentiary foundation with charges which were identified. *See* the district court's opinion in *Arnold,* 576 F.Supp. 304, 309 (Nordberg, J.).

the Court long. First, Shields contends that the application failed to identify the law enforcement officer authorizing the application. *See* 18 U.S.C. § 2516(1) (listing officers who may authorize applications for the interception of wire or oral communications), 2518(1)(a) (requiring the application for interception to identify the officer who approved the application). This argument holds no merit, for an application under § 2517(5) is not an application to intercept communications, but a request for authority to make testimonial use of communications already intercepted. Section 2517(5) does not require that any of the officers identified in § 2516(1) must approve an application made under § 2517(5), nor does it require the application to identify the officer who supplied such approval, and Shields cites no authority for the proposition that such a requirement should be read into the statute.

■ Second, Shields argues that the application failed to establish that the August 29, 1988, order permitting surveillance was properly obtained, that the government acted in good faith and not in subterfuge in seeking the order, and that the additional communications were intercepted incidentally to the authorized surveillance. *See Arnold*, 773 F.2d at 829. This contention also fails. Section 2517(5) does not impose any specific requirements on the contents of the post-interception application, and although *Arnold* identifies the showing which the government must make in order to secure approval under § 2517(5), the contents of Judge Moran's order granting the approval reflect that such a showing was made to his satisfaction. Thus, Judge Moran expressly found that the communications concerning additional offenses were obtained in compliance with Title III, and that the authorization to engage in surveillance had been "lawfully obtained and sought in good faith by the applicants for the purpose of investigating the offenses described in that order." (Order of May 21, 1991 at 6 ¶ 3.) Given his familiarity with the circumstances of the authorization orders, and in light of the facts which were set forth in the government's § 2517(5) application, Judge Moran had a substantial basis for concluding that the government had satisfied the requirements of *Arnold*. That the government did not formally recite the considerations set forth in *Arnold* is immaterial, particularly in the absence of any showing that these considerations were not met.

## IV. CONCLUSION

For the reasons set forth above, Shields' motions to suppress evidence and to dismiss the superseding indictment based upon illegal electronic surveillance is denied. DeLeo's motion to suppress or dismiss the superseding indictment upon the same grounds is denied for the same reasons.